DAVID ORTIZ ANGLERÓ y OTROS, demandantes y apelados, *v.* GERINELDO BARRETO PÉREZ y OTROS, demandados y apelantes.

*Número:* O-80-355      *Resuelto:* 24 de junio de 1980

*Héctor A. Colón Cruz, Procurador General, y Reina Colón, Procuradora General Auxiliar,* abogados de los apelantes; *Pedro J. Varela, Rafael Pérez Marchand, Francisco Ariel Avilés, Lorenzo Lagarde Garcés, Andrés Salas Soler, Alcides Oquendo, Yamil Galib Frangie, Juan Manuel García Passalacqua, Antonio Fernós López-Cepero y Graciany Miranda Marchand,* abogados de los apelados.

EL JUEZ PRESIDENTE SEÑOR TRÍAS MONGE emitió la opinión del Tribunal.

El asunto a resolver en este caso no es si debe o no enmendarse la Constitución del Estado Libre Asociado para limitar

el derecho a fianza. Esa es una controversia de índole política sobre la que este Tribunal no puede pronunciarse. *Baker* v. *Carr*, 369 U.S. 186 (1962) ; *Santa Aponte* v. *Srio. del Senado*, 105 D.P.R. 750 (1977). Este litigio plantea tan solo una cuestión estrictamente jurídica: la permisibilidad de disponer que únicamente los electores inscritos hasta celebradas las inscripciones parciales del 27 de enero de 1980 podrán votar en el referéndum de 29 de junio de 1980 sobre la enmienda propuesta al derecho a fianza.

## I. *Los hechos*

La Resolución Concurrente Núm. 30 de 21 de junio de 1979 fijó inicialmente la fecha del referéndum para el 6 de abril de 1980. La Asamblea Legislativa de Puerto Rico cambió luego([1]) esta fecha para el 29 de junio de 1980.

Entre el 21 de junio de 1979 y el 6 de abril de 1980 no se formuló la ley habilitadora necesaria para establecer el procedimiento de votación y los requisitos de los votantes ni se asignaron fondos públicos para el referéndum. Ello motivó principalmente, según concluyó el tribunal de instancia, el citado cambio de fecha.

Conforme a los poderes que le reconoce el Art. 2.021 de la Ley Electoral, 16 L.P.R.A. sec. 3071, ([2]) la Comisión Estatal de Elecciones ordenó una inscripción parcial para el 21 de octubre de 1979 de los electores potenciales no inscritos hasta

---

([1]) Véase la Res. Conc. Núm. 32 de 26 de marzo de 1980.

([2]) Este artículo disponía originalmente:

"La Comisión dispondrá mediante reglamento o resolución, las fechas en que semestralmente a partir del primer día del mes de enero de 1978, habrán de celebrarse inscripciones parciales conforme las disposiciones de este Subtítulo.

".    .    .    .    .    .    .

"A partir del mes de noviembre, inclusive, del año anterior a una elección general, las inscripciones parciales deberán celebrarse mensualmente hasta la fecha para el cierre del registro prescrito en la sec. 3066 de este título."

La Sec. 4 de la Ley Núm. 153 de 20 de julio de 1979 derogó el último párrafo del artículo citado. Esta eliminación es precisamente lo que crea el problema constitucional que este pleito suscita.

entonces. Más tarde se ordenó otra inscripción parcial para el 27 de enero de 1980. Ésta es la última inscripción celebrada hasta el día de hoy, aunque la Comisión ha acordado o planificado, según determinación del Tribunal Superior, celebrar una última inscripción el 6 de julio de 1980, [3] pocos días después de la fecha señalada para el referéndum.

La cuestión precisa ante nuestra consideración es, en consecuencia, si pueden mediar ciento cincuenta y tres días, de 27 de enero a 29 de junio de 1980, entre la última inscripción de electores y la celebración del referéndum o, en otras palabras, si es constitucional el párrafo primero del Art. 3 de la Ley Núm. 14 de 9 de abril de 1980, el cual establece que sólo podrán votar en el referéndum los electores que figuren en el Registro del Cuerpo Electoral y los que se inscribieron el 27 de enero de 1980.

La cuestión afecta a miles de ciudadanos. La Comisión calcula que el 6 de julio de 1980 se inscribirán entre cincuenta y sesenta mil electores. El Tribunal Superior estimó, a la luz de la prueba desfilada, que un número sustancial de ciudadanos está impedido de ejercer, en el referéndum, su derecho al voto. También concluyó que el período entre el cierre de las listas electorales y la fecha fijada para el referéndum es injustificadamente largo. El tribunal de instancia procedió por ésta y otras razones a dictar un interdicto permanente en que ordena que el referéndum no se celebre antes de las inscripciones del 6 de julio de 1980. El Estado solicita que revoquemos esta decisión.

---

[3] El Art. 2.016 de la Ley Electoral, 16 L.P.R.A. sec. 3066, provee:

"No se autorizará la inscripción, ni la transferencia de ningún elector potencial o inscrito para una elección desde los ciento veinte (120) días previos a las elecciones."

Lo que hoy resolvemos revela las graves dificultades constitucionales del citado Art. 2.016 y del requisito de cuatro meses que impone el Art. 2.003 de la referida ley. Véanse: *Marston* v. *Lewis*, 410 U.S. 679 (1973), y *Burns* v. *Fortson*, 410 U.S. 686 (1973).

II. *El tratamiento del problema en Estados Unidos*

A. *La naturaleza del derecho al voto*

Aunque la Constitución de Estados Unidos no menciona específicamente el derecho al sufragio, excepto en situaciones inaplicables al caso presente, (⁴) la condición fundamental y preeminente de este derecho se ha reconocido a cabalidad. El Tribunal Supremo de Estados Unidos expresó en *Reynolds* v. *Sims*, 377 U.S. 533, 555 (1964) :

> El derecho a votar libremente por el candidato que el elector desee es esencial a toda sociedad democrática. Cualquier restricción de ese derecho ataca el corazón de los gobiernos representativos.

Desde 1886, en efecto, ya había expresado el Tribunal en *Yick Wo* v. *Hopkins*, 118 U.S. 356, 370 (1886) :

> . . . el voto . . . se considera un derecho político fundamental debido a que preserva todos los demás derechos.

Véanse: *Kramer* v. *Union School Dist.*, 395 U.S. 621, 628 (1969) ; *Harper* v. *Virginia Bd. of Elections*, 383 U.S. 663, 665 (1966) ; *Dunn* v. *Blumstein*, 405 U.S. 330, 336–37 (1972) ; *Developments in the Law, "Elections"*, 88 Harv. L. Rev. 1111, 1118 (1975) ; Kirby, *The Constitutional Right to Vote*, 45 N.Y.U. L. Rev. 995 (1970).

El derecho al voto es de orden tan fundamental que se estima que el examen de posibles obstrucciones al mismo es uno de los usos básicos del poder de revisión judicial. John Hart Ely ha afirmado recientemente en su obra *Democracy and Distrust: A Theory of Judicial Review*, Cambridge, Mass., Harvard U. Press, 1980, pág. 117 :

> . . . la tarea primordial de la revisión judicial es la remoción de obstrucciones en el proceso democrático. La denegación del voto parece ser la quintaesencia de esas obstrucciones.

El derecho al voto en situaciones idénticas o análogas a la que nos ocupa se ha derivado principalmente de las cláusulas

---

(⁴) Véase, por ejemplo, la enmienda decimoquinta.

sobre la igual protección de las leyes y el debido proceso de ley. Note, *Constitutional Standards Applicable to Voter Registration Closing Dates*, 5 U. Mich. J.L. Ref. 304, 308 *et seq.* (1972); Comment, *Access to Voter Registration*, 9 Harv. Civ. Rights Civ. Lib. L. Rev. 482, 494 *et seq.* (1974).

Para la década de los años sesenta el Tribunal Supremo de Estados Unidos utilizó el método de la revisión judicial estricta como criterio para evaluar impedimentos contra el derecho al voto. *Harper*, supra; *Dunn*, supra; *Carrington* v. *Rash*, 380 U.S. 89 (1965); *Evans* v. *Cornman*, 398 U.S. 419 (1970); *Kramer*, supra. Luego ha surgido un interés renovado en el empleo de la cláusula sobre el debido proceso de ley. Tribe, *The Supreme Court, 1972 Term—Foreword: Toward a Model of Roles in the Due Process of Life and Law*, 87 Harv. L. Rev. 1, 5–6 (1973); Comment, *Access to Voter Registration*, 9 Harv. Civ. Rights Civ. Lib. L. Rev. 482, 511 *et seq.* (1974).

A la luz de estos principios se ha desarrollado en Estados Unidos una doctrina de notable interés sobre las normas que rigen el cierre de las inscripciones antes de una elección.

B. *La doctrina sobre el asunto.*

En *Dunn* v. *Blumstein*, 405 U.S. 330 (1972), el Tribunal Supremo de Estados Unidos falló que un estatuto de Tennessee que imponía, como condición para votar, el requisito de haber residido en el estado el año inmediatamente antes —y en el condado tres meses inmediatamente antes— de las elecciones violaba la igual protección de las leyes. El Tribunal estimó que no existía un interés apremiante del Estado en imponer términos tan largos. Afirmó el Tribunal, que en el curso de la opinión se refirió a *Oregon* v. *Mitchell*, 400 U.S. 112 (1970), donde validó la disposición de la Ley sobre los Derechos Referentes al Voto, 42 U.S.C.A. sec. 1973aa-1(d), que prohíbe a los estados cerrar las inscripciones en las elecciones presidenciales y vicepresidenciales más de 30 días antes de estos comicios:

La fijación de un término constitucionalmente aceptable es una cuestión de grado. Basta señalar aquí que treinta días parece constituir un plazo amplio para que el Estado complete las tareas administrativas que sean necesarias para evitar el fraude —*y que un año o tres meses es demasiado*. 405 U.S. 330, 348. (Énfasis nuestro.)

A partir de *Dunn* se consideró específicamente el problema de la fecha del cierre de las inscripciones por varios tribunales. En el primer caso de *Ferguson* v. *Williams*, 330 F.Supp. 1012 (N.D. Miss. 1971), anterior a *Dunn*, un tribunal de tres jueces resolvió que era constitucional el Art. 12, Sec. 251, de la Constitución de Mississippí, el cual disponía que "Los electores no se inscribirán dentro de los cuatro meses anteriores a una elección . . . pero . . . ninguna persona que, en lo que respecta a su edad y residencia, hubiese de adquirir el derecho a votar dentro de esos cuatro meses será impedida de inscribirse [por lo menos cuatro meses antes] por razón de no cumplir con los requisitos [de residencia y edad] al momento de la inscripción". El caso se apeló al Tribunal Supremo de Estados Unidos y éste dejó el fallo sin efecto y devolvió el caso a instancia para su consideración a la luz de *Dunn*. *Ferguson* v. *Williams*, 405 U.S. 1036 (1972).

El tribunal de instancia reconsideró el caso y declaró inconstitucional la disposición citada de la Constitución de Mississippí por considerar que el cierre de las inscripciones cuatro meses antes de una elección viola la cláusula sobre la igual protección de las leyes de la Constitución de Estados Unidos. *Ferguson* v. *Williams*, 343 F.Supp. 654 (N.D. Miss. 1972).

En *Marston* v. *Lewis*, 410 U.S. 679 (1973), y *Burns* v. *Fortson*, 410 U.S. 686 (1973), el Tribunal Supremo de Estados Unidos enfrentó de nuevo el problema de la fecha apropiada para el cierre de las inscripciones. En *Marston* se resolvió que era constitucional una ley de Arizona que establecía un período máximo de cincuenta días entre las elecciones y la celebración de la última inscripción de electores. El Tribunal

citó con aprobación, no obstante, sus expresiones en *Dunn* sobre la naturaleza excesiva de un plazo de tres meses.

El Tribunal Supremo de Estados Unidos resolvió igualmente en *Burns* que el término de cincuenta días vigente en Georgia era permisible, mas expresó que tal período "se acerca a los linderos constitucionales extremos en este campo . . .". 410 U.S. 686, 687.

*Dunn, Ferguson II, Marston* y *Burns* representan el derecho actual en Estados Unidos sobre la fecha constitucionalmente permisible para el cierre de las inscripciones. Otras decisiones han acatado, como es natural, estas normas. Véanse: *Hinnant* v. *Sebesta*, 363 F.Supp. 398 (M.D. Fla. 1973); *Avrutick* v. *Wilson*, 382 F.Supp. 984 (S.D. N.Y. 1974); y *Young* v. *Gnoss*, 496 P.2d 445 (Cal. 1972), en el que el Tribunal Supremo de California determinó *en banc* que un plazo de cincuenta y cuatro días para el cierre final de las inscripciones es inconstitucional.

El examen de los términos de cierre prescritos en Estados Unidos es de sumo interés. Aun antes de *Ferguson II*, el plazo promedio establecido en los estados de la Unión para el cierre de las inscripciones era de treinta y tres días antes de la votación. Note, *Constitutional Standards Applicable to Voter Registration Closing Dates*, 5 U. Mich. J.L. Ref. 304, 306, 328 *et seq.* (1972). En la jurisdicción federal, como hemos indicado, el término es de treinta días. 42 U.S.C.A. sec. 1973aa-1 (d).

■ Existe amplia justificación para el desarrollo de la doctrina y la práctica aquí resumidas. El propósito de tales normas es garantizar a los electores potenciales la debida oportunidad de enterarse, meditar sobre la cuestión en controversia y votar.

■ Bajo la Constitución de Estados Unidos resulta claro, a la luz de lo anterior, que el término de 153 días comprendido entre el cierre de las inscripciones, 27 de enero de 1980,

y la fecha del referéndum, 29 de junio de 1980, es inconstitucional.

Corresponde ahora examinar si factores constitucionales locales exigen un resultado distinto.

III. *Análisis del problema bajo la Constitución del Estado Libre Asociado*

Fuera de que las cláusulas sobre la igual protección de las leyes y el debido proceso de ley de la Constitución de Estados Unidos aplican en Puerto Rico y determinan el contenido mínimo de las cláusulas equivalentes de la Constitución del Estado Libre Asociado, *Pueblo* v. *Dolce*, 105 D.P.R. 422 (1976), esta última constitución reconoce expresamente el derecho al "sufragio universal igual, directo y secreto...". Art. II, Sec. 2, de la Constitución de Puerto Rico.[5] En el Preámbulo de nuestra Constitución se recalca la importancia de la democracia para la vida de la comunidad puertorriqueña y lo fundamental del voto para la existencia de esa democracia. Los debates en la Convención Constituyente destacan la naturaleza esencial del voto. *Diario de Sesiones de la Convención Constituyente*, ed. 1961, T. 2, págs. 1103-04 (1951 y 1952) ; *Ibid.*, T. 4, pág. 2563.

Consideramos que la Constitución del Estado Libre Asociado, al igual que la de Estados Unidos, exige, para el adecuado ejercicio del derecho al voto, que medie un término razonable entre la fecha del propuesto referéndum y el cierre de las inscripciones. Toca a la Asamblea Legislativa fijar ese término dentro de los parámetros constitucionales permisibles. Todo obstáculo al voto debe ser objeto de escrutinio judicial vigoroso, mas con la debida atención de dar el debido peso a los intereses apremiantes del Estado. Comment, *Access to Voter Registration*, 9 Harv. Civ. Rights Civ. Lib. L. Rev. 482, 511 (1974).

---

[5] Esta disposición proviene del Art. 21(3) de la Declaración Universal de los Derechos del Hombre.

■ Resolvemos en consecuencia que el término de ciento cincuenta y tres días que mediaría entre las últimas inscripciones y la fecha del referéndum es impermisiblemente amplio bajo la Constitución de Puerto Rico, especialmente en ausencia de prueba en los autos de la necesidad apremiante y preeminente de utilizar un plazo de tal orden y la experiencia de otras comunidades con plazos muchísimo más cortos.

## IV. *Otros planteamientos*

■ Los planteamientos de la parte apelante fueron resueltos satisfactoriamente por el juez de instancia, Hon. Peter Ortiz. Respecto a la alegación de si este pleito es o no un pleito de clase, valga decir que es innecesario que nos pronunciemos sobre el particular. El pleito es sostenible como una petición de sentencia declaratoria e interdicto por personas claramente afectadas por la ley aquí cuestionada. 7 Wright & Miller, *Federal Practice and Procedure: Civil*, sec. 1771, págs. 663–64 (1972); *Gregory v. Litton Systems, Inc.*, 316 F.Supp. 401, 403 (C.D. Cal. 1970).

En cuanto a otras alternativas de inscripción, viables en o antes del 29 de junio de 1980, la alternativa al efecto de que pueda votar en el referéndum mediante declaración jurada toda persona que reúna los requisitos correspondientes, no es posible. La prueba revela que esta solución es impracticable. Tampoco está inmune al fraude, en particular, conforme el alegato del Procurador General, en lo que toca al proceso de votación en colegio abierto.

Lo que hoy resolvemos no menoscaba la facultad de las ramas ejecutiva y legislativa del Gobierno de celebrar el referéndum sobre la fianza, sujeto a las normas constitucionales aplicables, dentro de un término razonable entre unas nuevas inscripciones parciales y la nueva fecha que se señale para el referéndum.

*Por las consideraciones expuestas, se confirma la sentencia dictada.*

El Juez Asociado Señor Negrón García concurre en opinión separada.

—O—

Opinión concurrente emitida por el Juez Asociado Señor Negrón García.

San Juan, Puerto Rico, a 24 de junio de 1980

De correcta juridicidad estimamos la elaborada opinión y sentencia de *Injunction* del Tribunal Superior, Sala de San Juan, fechada 19 de junio de 1980, que suspende el referéndum especial sobre la propuesta enmienda constitucional que afecta el derecho absoluto a la fianza, fijado para el próximo 29 de junio de 1980, a base de que el Art. 3, párrafo primero, de la ley habilitadora del referéndum —Ley Núm. 14 de 9 de abril de 1980— es inconstitucional.

### Reflexiones éticas

Antes de todo, advertimos que al margen de cada controversia jurídico-constitucional se plantea una de naturaleza ética. Así ocurre en el caso de autos en el cual está presente un problema deontológico de amplias dimensiones que de generalizarse podría causar una erosión irremediable a la raíz que sostiene la representación y confianza del poder judicial: su independencia e imparcialidad.

Nos preocupan sobremanera algunos acontecimientos recientes y lamentablemente ello es signo susceptible de interpretarse como que la judicatura puertorriqueña está innecesariamente involucrándose en las polémicas de asuntos públicos polarizados, matizados o impregnados de contenido político partidista, afectando así su imagen de imparcialidad y neutralidad. Estas inquietudes nos incitan a pensar y a dejar constancia a tiempo de nuestras reflexiones sobre el particular.

Reconocemos que "[n]o es necesario ni deseable que el Juez viva en el aislamiento". Canon XXIV. No somos autó-

matas del derecho, ajenos a las injusticias, el dolor o a los agravios. No vivimos en mundos distantes o apartes. Neutralidad judicial no es sinónimo de insensibilidad.[1] "En efecto, sólo personas vivientes en el seno de lo abstracto, injustas con la realidad por alejadas a ella, dogmáticas sin punta de humanidad, pueden exigir o pretender exigir del Juez la renuncia a uno de los dones más preciados de la vida: una verdadera amistad, unos buenos amigos, o, simplemente, una relación menos íntima con los demás, hasta el punto de exigir un forzado e inhumano aislamiento. Nada más fatal que la atmósfera de la soledad, donde la melancolía o el ensueño inútil tienen su asiento." C. De La Vega Benayas, *Moral, estilo y función judicial,* citado por Martínez Calcerrada, *Independencia del Poder Judicial,* Madrid, Ed. Rev. Der. Judicial, 1970, pág. 75.

La creación e intervención pública de la Asociación de la Judicatura Puertorriqueña,[2] que expone puntos de vista y

---

[1] La línea es tenue y difícil de lograr. Ilustran un fino balance las siguientes expresiones:

"Cuando alguien viste la toga de juez se desviste de todo derecho a inmiscuirse en el partidismo político. Lo que no pierde, lo que es irrenunciable, es su derecho y su deber de atacar la injusticia, de cualquier naturaleza que sea, dondequiera que asome." José Trías Monge, *La Crisis del Derecho en Puerto Rico,* Publicaciones J.T.S., Inc., 1979, pág. 32.

En este sentido deben evaluarse las palabras pronunciadas en la inauguración del Centro Judicial de Carolina, el 25 de abril de 1980, por el Juez Presidente, Señor José Trías Monge, en particular, ". . . esta es una sociedad que tolera una tasa de desempleo vergonzosamente alta, una inflación devastadora, una distribución inaceptable de la riqueza, un sistema educativo atroz, un sistema inadecuado de salud, un grado de corrupción oficial inquietante, una intolerancia inadmisible para con el disidente. Esta es una sociedad limosnera, donde a veces se compensa el ocio mejor que el trabajo; una sociedad atacada por el germen de una politiquería vocinglera, mediocre y repelente . . .".

[2] Independientemente del interesante problema jurídico que presenta la legalidad de su existencia misma y su carácter representativo en los múltiples aspectos que pudiera desembocar en un choque con la estructura constitucional unificada, su adecuado funcionamiento, y el primer deber ineludible e infragmentable de los jueces individualmente, es administrar incualificada y pronta justicia.

debate sus posiciones institucionales con funcionarios de las otras ramas gubernamentales, (³) anticipa inintencionalmente criterios sobre asuntos que luego son sometidos a algunos de sus miembros; la celebración de una Conferencia Judicial en que se prepara, adopta y solicita el endoso de los jueces en torno a un informe sobre la fianza (⁴) en el cual se adelantan y emiten ostensiblemente juicios críticos contra la enmienda constitucional e inadvertidamente se da la impresión de que ésa es la política oficial de la Rama Judicial; y los discursos y artículos de prensa esporádicos de jueces que expresan públicamente sus opiniones con lenguaje susceptible de ser interpretado erróneamente como exposiciones o críticas sobre cuestiones que no competen a la rama judicial, en distintos foros, o que constituyen ataques a actuaciones de los otros poderes constitucionales —sin desearlo sus protagonistas— son instancias aisladas que podrían visualizarse como una tónica que debilita y afecta el *quid pro quo* en que se apuntala la independencia judicial. Aleja, además, peligrosamente a la Rama Judicial de la tradicional postura de neutralidad, objetividad e imparcialidad observada y honrada por la judicatura del pasado en todos sus niveles. Esta generación —al igual que las anteriores— es custodia celosa de dichos principios y debe proclamarlos con excelsitud, no en provecho propio o de una simple exposición teorizante, sino para beneficio y práctica de toda la sociedad:

[L]a Independencia [judicial] *tiene su raíz en un movimiento espiritual:* podrá el cimiento económico ser condición casi indispensable para su ejercicio; podrán el vigor mental y la disciplina científica servir de eficaces coadyuvantes; pero, en definitiva, la independencia *nace con el sentimiento de la propia valía y el convencimiento de la misión que se realiza;* y una vez arraigados aquel sentimiento y esta convicción, el juzgador se da

---

(³) *El Mundo,* 15 de febrero de 1980, pág. 15B.

(⁴) Secretariado de la Conferencia Judicial, *Informe sobre la Fianza,* Sexta Sesión Plenaria (Nov. 1979), págs. 17–26, 96–100, y 103.

cuenta de la autoridad que posee, y sintiéndose ligado a una tradición secular y venerable, encuentra en todo ello la firme garantía de su falta de supeditación a toda clase de indicaciones y exigencias. *La independencia, en suma, se logra siempre que el Poder Judicial tiene conciencia clara de su augusta función, y cada vez que uno de los individuos que lo componen adquiera concepto preciso de que pertenece a aquel Poder, ha de estar a la altura que esto exige, no le es lícito transmitir mermado a su sucesor el depósito de prestigio que él recibiera, y ha de arrostrar impasible las consecuencias de sus actos. . . .* (Bastardillas nuestras.) J. Estrada, citado por Martínez Calcerrada, *op. cit.,* pág. 58.

## I

Antes de que se perfeccionara la apelación de este pleito que impugna el referéndum de la fianza, nos habíamos preguntado si las exposiciones públicas de algunos jueces podían afectar la imagen de imparcialidad de la rama judicial para adjudicarlo. ¿Cuál podía ser la impresión de la ciudadanía si el Director Administrativo de los Tribunales —representante constitucional del Señor Juez Presidente— en un artículo periodístico denominado "Defiende a la Judicatura" afirmaba que "cuando recomendamos eliminar el derecho a la fianza, debemos saber que estamos empañando al mismo tiempo el principio constitucional de la presunción de inocencia"?[5] ¿Creería erradamente el público que tal expresión era la posición oficial de este Tribunal o que actuaba como portavoz emisor del Juez Presidente? ¿Por qué concebir desacertadamente que la Rama Judicial tiene que actuar como los otros dos poderes políticos exponiendo y adoptando posiciones, y anticipando criterios sobre asuntos volátiles, cuya decisión no es de su jurisdicción en ese momento? ¿Ayuda en algo a su imagen el que algunos jueces se manifiesten en contra y otros a favor de la enmienda constitucional? ¿Puede separarse, para fines éticos, el pronunciamiento público a título personal

---

[5] *El Nuevo Día,* 22 de mayo de 1980, pág. 36; *id.,* 6 de junio de 1980, pág. 28.

de un juez, de aquel que irradia de la mera condición del cargo? Cuando cualquier magistrado de reconocido prestigio habla en ocasión de una actividad oficial relacionada con la administración del sistema de justicia, ¿puede desdoblar su persona a cuando pronuncia un discurso distinto en otro foro? ¿Es posible dividir la personalidad del juez, divorciando su opinión personal de la del símbolo del jurista? ¿Vamos a olvidar la idoneidad y ejemplaridad que proyectan los pronunciamientos de los jueces? ¿Es que tales opiniones personales carecen de impacto psicológico comunitario, en virtud del rango, categoría y carisma profesional que los jueces poseen? Finalmente, ¿se reducirá o no el elemento de imparcialidad y neutralidad judicial de proliferarse los pronunciamientos públicos de los jueces?

Aunque no de manera exhaustiva, intentaremos suministrar las contestaciones adecuadas a estas interrogantes a base del fondo axiológico envuelto.

## II

La Constitución, como supranorma comunitaria, dispone en su Sec. 12, Art. V:

Ningún juez aportará dinero, en forma directa o indirecta, a organizaciones o partidos políticos, ni desempeñará cargos en la dirección de los mismos o participará en campañas políticas de clase alguna, ni podrá postularse para un cargo público electivo a menos que haya renunciado al de juez por lo menos seis meses antes de su nominación.

Esta prohibición es con el "propósito de establecer firmemente la independencia judicial . . . y librar al juez de toda influencia política indeseable".[6] A tono con los principios que irradian de este precepto prohibitivo, y para robustecer su rigor disciplinante, en el descargo de nuestra encomienda de pautar la conducta de los miembros de la judicatura, apro-

---

[6] *Diario de Sesiones de la Asamblea Constituyente*, T. 4, pág. 2614 (Ed. Equity).

bamos el Canon XIII de los de Ética Judicial, que en el elenco de conducta y actividades vedadas, en lo pertinente, reza:

Los Jueces deben proteger y promover la independencia del poder judicial como factor de equilibrio en la estructura gubernamental de nuestro sistema de vida democrática. A tal fin, el Juez debe abstenerse de participar en el proceso político, sin menoscabo, desde luego, de su derecho al sufragio, a sus propias ideas sobre cuestiones políticas, y a los deberes y funciones que le fijan las leyes y reglamentos electorales.

*Sin que la siguiente enumeración excluya otras actividades,* que por su carácter político le están vedadas, el Juez *no* debe:

. . . . . . . .

f) Hacer expresiones, comentarios o manifestaciones públicas sobre asuntos o actos de naturaleza política o partidista;

. . . . . . . .

i) Atacar públicamente o entablar polémicas con candidatos o líderes políticos, sin menoscabo, desde luego, de su derecho a defenderse de ataques abusivos *a su persona* o *a su honra;*

. . . . . . . .

El Juez debe estar y sentirse exento de toda influencia política *y no debe dar base* con su conducta para la creencia de que sus ideas políticas influyen en el cumplimiento de sus funciones judiciales.

Es *deber* del Juez, además, *velar* por que los otros funcionarios y empleados de los tribunales que estén *bajo su dirección* no empañen con su conducta política la imagen de imparcialidad del sistema judicial. *Cánones de Ética Judicial,* 106 D.P.R. 1096– 97 (1977). (Bastardillas nuestras.)

De este texto se pueden derivar varias observaciones. *Primero,* la adherencia a estas reglas éticas exige reconocer que la conducta subjetivizada se estigmatiza al exteriorizar una particular mentalidad ideológica. En *segundo* lugar, se pone de manifiesto el principio rector en los Cánones de Ética Judicial, de que *un juez no puede hacer indirectamente, o mediante grupo, lo que directa o individualmente le está éticamente vedado.* En otras palabras, toda prohibición ética no sólo veda la acción de tipo personal, sino de cualquiera otra índole si se origina a base de presiones o influencias del ente

judicial, aunque el vehículo institucional, medio, foro o agente materializador, sea distinto. *Tercero*, el pilar y requisito *sine qua non* para todo reclamo de independencia judicial es el principio denominado "neutralidad de la magistratura", concepto acuñado por Castán, quien con referencia a su importante vertiente de neutralidad *política* nos dice:

> El Juez, naturalmente, tiene deberes hacia su Patria y ha de tener convicciones políticas como cualquier ciudadano. Mas por muy afecto que sea a una ideología política, debe en el ejercicio de su función judicial hacer justicia y no servicios. *Poder Judicial e Independencia Judicial,* Ed. Reus, 1951, pág. 49.

*Cuarto*, la natural y necesaria inhibición consagrada en la Constitución y las limitaciones éticas dimanantes del cargo judicial existen sin perjuicio del ejercicio al sufragio y de tener y mantener creencias o ideas políticas o ideológicas en lo más intimo de la conciencia. Aclaramos que lo que para algunos se reduce a un problema de invocar el derecho a una irrestricta libre expresión, para nosotros es un asunto de ética, prudencia y moderación. *Quinto*, no es suficiente proclamar que en la práctica somos rectos e imparciales. Es esencial que tal rectitud e imparcialidad se manifiesten continuamente en todos los actos del Juez en abono de la confianza y fe pública.(⁷) *"El Juez no solamente ha de ser imparcial, sino que su conducta ha de excluir toda posible apariencia* de que es susceptible de actuar a base de influencias de personas, grupos o partidos, o de ser influido por el clamor público, por consideraciones de popularidad o notoriedad, o por motivaciones impropias." Canon XI de Ética. (Bastardillas nuestras.) Esa

---

(⁷) "Debemos evitar la impresión, aunque ésta sea errónea, de que decimos unas cosas en nuestros discursos y escritos y hacemos otras en la práctica." *García Cruz* v. *El Mundo, Inc.,* (Opinión concurrente emitida por el Juez Asociado señor Rigau el 9 de enero de 1979). Sería un contrasentido insistir en el futuro en promover la independencia de la rama judicial —separándola del debate político e ideológico del país— si es distinta la tónica pública sentada.

norma y el dogma de legalidad constituyen el único control reductor de la actividad judicial. (⁸)

[Al Juez] [n]o le cabe ni aprovecharse de sus conocimientos o reputación, ni de sus convicciones sociales, ni de sus acrisoladas virtudes, para proyectarse en otro campo de actuación pública o privada, en donde, sin un directo menoscabo para la integridad o rectitud de su función, pueda desarrollar sus facultades. Cuando, pues, convive al margen de su sede jurisdiccional, es el ciudadano más anónimo y dinámicamente tarado que se conoce, *porque se le niega lo que a los demás, por ley y Constitución, se les otorga o reconoce. Es la servidumbre a la excelsitud de su oficio: Como órgano Judicial, un "prius" socio-público, como ciudadano un "mitius" personal.* (Bastardillas nuestras.) Martínez Calcerrada, *op. cit.,* pág. 209.

Nos causa desasosiego la posibilidad de que en el futuro algunos pronunciamientos fuera del estrado sean equivocadamente apreciados como críticas gratuitas a las otras ramas gubernamentales, que exacerban innecesariamente las naturales zonas de fricción existentes entre los órganos constitucionales. Debemos evitar esta especulación, pues la garantía del dogma de independencia judicial se torna superflua cuando ello ocurre.

El juez o el magistrado, que toma parte activa en determinadas candidaturas, y el que en manifestaciones públicas se declara partidario intransigente de una idea política, por más que a la puerta del Tribunal se despoje de su afección y de sus oídos, no será creído por el que tenga que comparecer ante él en demanda de justicia, cuando su adversario pertenece al bando político a que ese juez se halle afiliado. El litigante habrá siempre de

---

(⁸) Así, aquellos abogados para quienes estas prohibiciones éticas representan una carga insostenible, deben evitar ponerse en tal encrucijada, absteniéndose de alcanzar un cargo judicial, canalizando directamente sus deseos de servicio público hacia las lides políticas partidistas, en calidad de protagonistas parlamentarios o de asesores. Lo contrario los expone a una infracción que excede lo racional y éticamente tolerable, debilita el poder judicial y permite la mala interpretación de atribuírseles el haberse inmiscuido indebidamente en los asuntos de los otros poderes gubernamentales.

considerarle parcial, enemigo suyo. . . . Citado por Martínez Calcerrada, pág. 206.

Al presente, para algunos, se puede dar la incorrecta impresión, de que por circunstancias propias del momento, las prohibiciones y dimensiones éticas comentadas han perdido importancia e interés. Basta señalar que, aparte de sus valores morales intrínsecos, la historia y experiencia de épocas pasadas justifica cabalmente las previsiones constitucionales y deontológicas. Hoy, ante el cuadro de disputas partidistas, las profundas pugnas políticas, el debate del derrotero o destino del país, la caracterización del fenómeno en el alza de la criminalidad como una controversia de índole política, y los ataques y críticas dirigidos contra nosotros los jueces —con razón o sin ella— justifican una invitación a que reiteremos nuestra adherencia continua e incesante a los méritos de dichos principios. No olvidemos que:

Los jueces son parte de la comunidad en que viven y por la posición que en ésta ocupan son llamados ocasionalmente a prestar su concurso en actividades de interés general, sean éstas de origen privado o estén auspiciadas por funcionarios públicos. *Esa cooperación, sin embargo tiene que darse dentro del marco de la Constitución, la ley y los Cánones de Ética Judicial y en armonía con la dignidad y las funciones de los tribunales.* Tales limitaciones imponen a los jueces la obligación de cerciorarse, por todos los medios dignos asequibles, de los propósitos y circunstancias de los actos a los cuales se les invite *y de abstenerse de asistir a aquéllos* que por su carácter les están vedados o *que razonablemente puedan dar lugar a la impresión de que se están transgrediendo esos límites. Es ésta la única manera en que puede la judicatura mantener incólume su reputación de absoluta independencia. In re: Participación Jueces,* 80 D.P.R. 784, 786–787 (1958). (Bastardillas nuestras.)

## III

Nuestras reflexiones sobre estas interrogantes nos mueven a concluir que la experiencia puede servir de contrapunto aleccionador. Todos estamos contestes en que se producen se-

rias perturbaciones a la imagen, confianza y atributo de neutralidad judicial, cuando alguno de sus integrantes interviene en asuntos que no le competen. Queda ello entonces a expensas del vaivén de la reputación, ideología o malas concepciones del magistrado interlocutor. Por tales motivos recomendamos total abstención en la participación de asuntos controversiales, análogos o relacionados, en menor o mayor grado, con polémicas político-partidistas.

Creemos que este Tribunal, en su función máxima constitucional, en el ejercicio de su jurisdicción administrativa disciplinaria y con el propósito de proveer espíritu de emulación y otros móviles estimulantes, debe exponer mediante resoluciones en casos adecuados su criterio orientador sobre el proceder ético apropiado. Ello evita que miembros de la judicatura —*bona fide*, por no existir una adecuada orientación o especificaciones éticas— puedan incurrir en desaciertos y empañar la imagen de neutralidad y objetividad judicial. La importancia de que ello se haga, no es exagerada. "En última instancia, toda institución valdrá lo que valgan las personas en quienes encarne. Por eso de la grandeza moral del juez dependerá, en gran parte, la grandeza moral de la vida jurídica de su país." Martín del Burgo, *La función judicial en España*, citado por Martínez, *op. cit.*, pág. 68.

Toda consulta futura de este género o asuntos parecidos debe ser referida a sesión plenaria de este foro. Allí corresponde se adopten formalmente los acuerdos del Tribunal. Ni el Juez Presidente ni el Director Administrativo de los Tribunales poseen facultad constitucional para ello. Cualquier consulta que estos funcionarios contesten —aunque orientadora y de incuestionable interés para nosotros— debe ser aclarándosele a los magistrados concernidos que ello representa —de ser tal desdoblamiento posible— una opinión individual y personal que no goza ni lleva impreso el sello oficial de estos superiores jerárquicos administrativos, y por ende, no ata a este Tribunal ni a sus Jueces Asociados.

No puede diversificarse la persona que a la vez es juez. El desempeño del cargo exige autolimitaciones que no se extienden a otras profesiones. La línea entre una opinión personal y cuando actúa como órgano judicial es muy tenue. Es casi imposible, por no decir ilusorio, deslindarla. Cuando se hace pública, se quiebra y desaparece. Así, la rúbrica judicial se proyecta en toda su extensión e intensidad en las opiniones de jueces a título personal y pueden sobrevenir malas interpretaciones y especulaciones. *Para los efectos señalados, un juez siempre es juez.* Esta unidad es concebida del siguiente modo:

El Juez no sólo está inserto en el mundo más estricto de su función, sino otro más amplio: el de la sociedad en general. Dentro de ésta, el juez, como cualquier otro, si bien distinto en su función, cumple y representa un papel. Para los otros, para los demás, él es el juez: *dentro y fuera del juzgado es el Juez. El carácter que imprime su función no le abandona* —salvo en la gran ciudad— *ya nunca,* excepto —*y no totalmente*— en el círculo estrecho de las amistades que pueda tener y conservar sin merma de su independencia, cosa difícil, pero posible. De la Vega Benayas, *Moral, estilo y función judicial,* citado por Martínez, *id.,* pág. 208.

En un acatamiento escrupuloso y riguroso, debe ser motivo de inhibición en todo pleito referente a tales asuntos —como es el presente impugnando el referéndum de fianza— el haber promovido o anticipado públicamente, directa o indirectamente, criterios al respecto.

En situaciones análogas, la negativa o ausencia de acuerdo por el Pleno, no puede privar a un magistrado de este foro el exponer, mediante voto explicativo radicado en la Secretaría, su parecer —como lo hacemos ahora en ocasión de certificarse esta resolución— en cuanto a la problemática ética de los miembros en general de la judicatura.

## IV

A tono con el panorama puertorriqueño presente y el enfoque expuesto, reiteramos que debimos adoptar la resolución

que transcribimos, tal y como lo recomendáramos vehemente, pero infructuosamente, el jueves 12 de junio de 1980.

En el descargo de nuestra encomienda de pautar la conducta de los miembros de la Judicatura del país, en aras de "promover la independencia del poder judicial como factor de equilibrio en la estructura gubernamental de nuestro sistema de vida democrática", y el mantenimiento de una postura de neutralidad y objetividad oficial —*Canon XIII de los de Ética Judicial*— y en consideración a que se ha impugnado ante los tribunales la legalidad y constitucionalidad del Referéndum sobre la propuesta enmienda constitucional que afecta el derecho absoluto a la fianza, a celebrarse el próximo 29 de junio de 1980, determinamos que al presente resulta impropio todo pronunciamiento público —fuera del que sea necesario dentro de la función adjudicativa— a favor o en contra de dicho Referéndum, por cualquier miembro de la judicatura puertorriqueña.

Este precepto ético en nada afecta el votar en el referéndum y ejercicio a la libre expresión de todo magistrado en el ámbito privado, con sujeción a los restantes Cánones de Ética Judicial.

Notifíquese al Director Administrativo de los Tribunales para su pronta comunicación a todos los Jueces de Primera Instancia.

## V

Para finiquitar, confesamos que, tratándose de incidencias aisladas, nuestras preocupaciones pueden ser infundadas. Tal vez las corrientes de la época sean pasajeras, inconsecuentes y no se justifique esta prevención. Ciertamente, inquietudes de esta índole prenden instintivamente en toda conciencia con un sentido de lo justo y ético, aunque es de lugar reconocer que en materia de deontología profesional se impone el respeto a todos —y con mayor justificación— no puede haber reclamos de infalibilidad. La ausencia de todos los elementos fácticos aconseja prudencia y abstención en pasar juicios finales críticos sobre instancias en particular.[9] No obstante, no podemos evitar pensar que esta po-

---

[9] Con excepción de la del juez sentenciador en el caso de autos, que con asepsia ética ejemplarizante expuso:

"Esta decisión nada tiene que ver con la forma en que los electores de

nencia suscite críticas o equívocos torpemente interpretados. Habrá a quienes el simple abordar este tema les resultará ruborizante, mortificante o un tanto irritante. No es ese nuestro deseo. Tampoco será la primera ni última vez que el quehacer judicial genere tales reacciones.

En nuestro empeño de vigorizar mediante medios apropiados —en unión a los demás miembros de este Tribunal— la independencia judicial, su imparcialidad, y proclamar como convicción arraigada del espíritu la excelsitud del imperio de la ética judicial, no cejaremos. Como otros, nuestra inspiración es, ha sido y será la judicatura. Su infusión simplemente se deriva de "que el verdadero Juez, cuya sentida vocación refuerza su capacidad de integridad, nunca hará dejación de su libre convicción porque se tambalee su personal prestigio o futuro profesional". Martínez, *op. cit.*, pág. 41. Con este invariable norte espiritual, aportamos estas reflexiones éticas al juicio valorativo e histórico de la presente y futura magistratura puertorriqueña.

## Juridicidad del Interdicto

La sinopsis de hechos revela que ocho ciudadanos, a nombre propio y de aquéllos que se hallan en circunstancias similares, instan acción interdictal para impugnar la validez del referéndum sobre enmienda constitucional, que se celebrará

---

nuestro país deben ejercer su voto; si a favor o en contra de la propuesta enmienda. No están presentes, ni estamos emitiendo juicio sobre varios puntos objeto de un intenso debate en nuestro país, tales como si el derecho absoluto a la fianza es una de las causas contribuyentes al alegado aumento de la criminalidad en Puerto Rico; si es o no cierto que un número sustancial de los crímenes serios y violentos son cometidos por personas gozando del privilegio de la fianza; si la aprobación de la enmienda va a tener un efecto positivo en el propósito del Estado de disminuir la criminalidad. Estos y otros factores serán analizados por nuestra ciudadanía al ejercer su derecho al voto." Y en nota al calce añadió:

"Menos aún nos toca comentar si todo este movimiento es uno causado por la histeria colectiva y/o motivado por fines puramente eleccionarios. Esas son cuestiones puramente políticas ajenas al ámbito de la decisión judicial."

el 29 de junio próximo por considerar que el procedimiento seguido con respecto al mismo infringe impermisiblemente su derecho al voto. No se hallan inscritos en el Registro del Cuerpo Electoral porque carecen de interés en votar en elecciones generales, sin embargo, por su carácter especial y naturaleza del asunto, sí desean participar en el referéndum sobre enmienda. Sostienen que al no celebrarse inscripciones luego de fijarse la fecha del referéndum, se les violaron sus derechos fundamentales. El tribunal acogió el planteamiento y proveyó el referéndum para fecha posterior a una inscripción regular que se celebrará el próximo mes de julio.

## VI

A la luz de este trasfondo fáctico expongamos nuestra opinión. A manera de prólogo hemos de dejar fiel constancia de la diferencia que existe entre una constitución y una ley. Aunque poseen rasgos parecidos, en el fondo hay una gran disimilitud: su majestuosidad e importancia. Se encuentra localizada en la cúspide de la pirámide estructural de orden jurídico. La constitución, aunque aspira a lograr una mayor estabilidad, como documento producto de la mente humana, no es permanente, sino flexible y dinámica. No cierra las puertas a las transformaciones culturales, sociales, políticas, económicas y geopolíticas que conllevan las sustituciones generacionales. Es más bien una declaración de principios contentivos de lineamientos fundamentales. ([10]) Rechaza todo inmo-

---

([10]) " 'El Derecho constitucional —escribe Sánchez Agesta— tiene un estilo propio que trasciende en formas gramaticales características.

" 'Los verbos propios de la vinculación o de la permisión jurídica, poder, exigir, deber, estar obligado o tener derecho, o cualquier otro verbo en los tiempos de futuro, que son las formas gramaticales específicas de la técnica jurídica, aparecen eclipsados por los tiempos de presente y el valor sustantivo del verbo ser con su carácter constitutivo y definidor. Los tiempos de futuro aparecen también con frecuencia, pero para expresar realizaciones concretas en un tiempo real; esto es, un programa o un fin a realizar y no la consecuencia de una situación jurídica hipotética. La constitución adquiere así un empaque especial, una característica gracia declara-

vilismo doctrinal y opera a base de las circunstancias históricas cambiantes. El genio creador y la fecundidad jurídica de la humanidad en la búsqueda de fórmulas justicieras de convivencia social, se nutren de formas abiertas, no enquistadas. Lo contrario expone a la carta constitucional al desuso, pérdida del respeto, reforma abrupta radical o que sea barrida fulminantemente por la violencia de las revoluciones. En evitación de estos cambios traumáticos, toda Ley Fundamental científicamente redactada e inteligentemente interpretada contiene su propia mecánica para fecundar y viabilizar el cambio: la cláusula de enmienda constitucional.

La nuestra no es excepción. Su Art. VII, Sec. 1, reza:

La Asamblea Legislativa podrá proponer enmiendas a esta Constitución mediante resolución concurrente que se apruebe por no menos de dos terceras partes del número total de los miembros de que se compone cada cámara. Toda proposición de enmienda se someterá a los *electores capacitados* en referéndum especial, pero la Asamblea Legislativa podrá, siempre que la resolución concurrente se apruebe por no menos de tres cuartas partes del número total de los miembros de que se compone cada cámara, disponer que el *referéndum* se celebre al mismo tiempo que la elección general siguiente. Cada proposición de enmienda deberá votarse separadamente y en ningún caso se podrá someter más de tres proposiciones de enmienda en un mismo referéndum. Toda enmienda contendrá sus propios términos de vigencia y formará parte de esta Constitución si es ratificada por el voto de la mayoría de los electores que voten sobre el particular. *Aprobada una proposición de enmienda, deberá publicarse con tres meses de antelación, por lo menos, a la fecha del referéndum.* (Bastardillas nuestras.)

Conforme el legajo de la Asamblea Constituyente, este precepto ". . . persigue dos objetivos básicos: hacer de la constitución un documento estable, *de mayor autoridad y dignidad que una ley,* a la vez que un instrumento flexible, sensible a cambios fundamentales en la opinión pública y en las necesi-

---

toria, o por mejor decir, definidora de lo que un pueblo quiere ser . . .' "
Xifra Heras, *Curso de Derecho Constitucional,* 1957, T. 1, págs. 84–85.

dades sociales". (Bastardillas nuestras.) *Diario, op. cit.,* pág. 2559.

Bajo el prisma judicial, se observa que la transcrita disposición contiene las siguientes características en cuanto a la metodología del cambio: (a) se origina por iniciativa de la Asamblea Legislativa; (b) mediante resolución concurrente que no requiere intervención del Poder Ejecutivo; (c) debe ser sometida a los "electores capacitados"; (d) en "referéndum *especial*", o conjuntamente en la elección general siguiente por disposición de dos terceras partes de los legisladores; (e) no pueden someterse más de tres (3) propuestas, por las que se votará separadamente; (f) poseerá términos de su vigencia; (g) deberá ser aprobada por mayoría de votos; y (h) cualquier propuesta al efecto, deberá "publicarse" por lo menos tres (3) meses antes de la fecha del referéndum.

De estas cualidades, hemos de elaborar con más detenimiento las que estimamos relevantes a la solución de la controversia. Veamos.

(i) *Electores Capacitados*

Esta exigencia constitucional tiene su equivalente conceptual en el Art. VI, Sec. 4, al prescribir que "[s]erá elector toda persona que haya cumplido diez y ocho años de edad, y reúna los demás requisitos que se determine por ley . . . . Se dispondrá por ley todo lo concerniente al proceso electoral y de *inscripción de electores* . . .". (Bastardillas nuestras.) Y como manto moderador y regulador, la Sec. 2, Art. II de la Carta de Derechos manda que tales ". . . leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto . . .".

Bajo la estructura y diseño electoral prevalecientes, el medio para que el ciudadano de edad suficiente acredite su idoneidad, como votante potencial, esto es "elector capacitado", ante el aparato administrativo gubernamental, es cumplimentar y jurar un formulario de inscripción. "Para ejercer

el derecho de voto no basta con reunir todos los ingredientes determinantes de la capacidad electoral; es preciso una condición más, que deriva de la misma mecánica de la votación: la inscripción . . . constituye el título definitivo para el ejercicio del derecho electoral." Xifra Heras, *op. cit.*, pág. 433. Así, la Ley Electoral vigente, según enmendada, (¹¹) confiere a la Comisión Estatal de Elecciones la facultad —mediante reglamento o resolución— de celebrar inscripciones parciales semestrales. Art. 2.021.

No es necesario mucho esfuerzo, como tampoco un exceso de verbosidad, para concluir que, sin la celebración de procesos de inscripción, no hay acreditación posible de los electores capacitados. Este tipo de actividad no sólo necesita una apropiada publicidad, sino que implica gastos operacionales, trámites administrativos de depuración en evitación de errores y fraude, y la participación activa de los partidos políticos reconocidos. Para resumir, la implementación del derecho al ejercicio del voto para cualquier evento electoral exige la acreditación de la capacidad del ciudadano, para lo cual es menester unas inscripciones. Simple y llanamente dicho, sin inscripciones no hay electores; sin electores no hay elecciones.

(ii) *Referéndum Especial*

Una explicación aceptable, descriptiva de su ámbito y virtud es:

El referéndum constituye la forma más divulgada de la actuación *directa* del cuerpo electoral a través del sufragio. Es un procedimiento por el que se llama al cuerpo de ciudadanos a decidir sobre un acto público, generalmente de naturaleza normativa. Se manifiesta de ordinario como una decisión del cuerpo electoral en el proceso legislativo de la que depende de eficacia o validez de la ley a que se refiere.

En todo caso, el referéndum constituye una manifestación del *autogobierno* del pueblo y refleja una desconfianza hacia los órganos representativos, pues a través de él la colectividad

---

(¹¹) Ley Núm. 153 de 20 de julio de 1979.

realiza directamente una *función pública*. Heras, *op. cit.*, págs. 393–394.

En Puerto Rico, el término es familiar. Ayuda a su definición legal lo contenido en el Código Electoral, a saber, "el procedimiento mediante el cual se somete al electorado del Estado Libre Asociado de Puerto Rico la aprobación o rechazo de uno o varios asuntos". Art. 1.003(39), (16 L.P.R.A. sec. 3003(39)). La palabra *especial* denota singularidad o particularidad en contraste con o a diferencia de aquello que es común, ordinario o general.[12]

(iii) *Publicación de la Proposición de Enmienda*

Este requisito es sumamente importante; es una garantía adicional. Ilustra el interés de los delegados constituyentes de que toda enmienda fuera sometida al crisol de una "opinión pública informada y consciente". Tratándose de modificaciones a la Ley Suprema, se tuvo mucho cuidado en evitar que el proceso pudiera "relegarse a un plano secundario". Por ende, la exigencia de debida publicidad fue con el objeto de darla a conocer al pueblo. 4 *Diario*, *op. cit.*, pág. 2559.

## VII

Al precisar los anteriores horizontes constitucionales, se destacan con meridiana claridad varios teoremas jurídicos. El *primero*, que un referéndum especial para enmendar la Constitución no puede celebrarse sin habérsele dado cumplimiento estricto a todos los requisitos constitucionales. *Segundo*, ello implica transmitir adecuada y apropiadamente al pueblo el posible cambio, lo cual se logra publicando tres meses antes el contenido de la propuesta enmienda. *Tercero*, realizada la publicación oficial, es necesaria la celebración de una "inscripción especial" para dar oportunidad plena a que los electores que no se inscriben en las inscripciones regulares en contemplación de las elecciones generales del

---

[12] Véase *Diccionario de la Lengua Española*, (1970), pág. 569.

país —por cualesquiera razones, desde la apatía, protesta silenciosa, religiosa, ideológica, ausencia, enfermedad, y otras— lo hagan. De ningún otro modo puede entenderse la correlación y concatenación racional que existe entre un "referéndum especial" y su aprobación por "electores capacitados". *Cuarto*, la inscripción especial es consustancial con la celebración del referéndum. Lo contrario plantea un serio discrimen de carácter intolerable.

Únicamente celebrando una inscripción *después* de haberse publicado lo que denominamos *edicto constitucional* —que informa al pueblo del texto de la propuesta enmienda y lo convoca a que oportunamente manifieste su suprema voluntad— es que le damos eficacia y virtualidad a los conceptos antes enunciados.

*Quinto*, el precedente modelador de este trámite constituye la publicación por la Asamblea Constituyente de la propia Constitución en cuatro (4) periódicos de circulación general y su profusa distribución. (Resolución Boletín Administrativo Núm. E. G. 160 de 21 de febrero de 1952.)

Observamos, además, que la fecha de celebración es clave para los fines inscripcionarios. Un referéndum especial tiene sus propias peculiaridades. No se conoce el carácter de la consulta como tampoco la fecha de su celebración hasta que así se determina y publica por el Poder Legislativo. En contraste, la Constitución provee con cierta precisión y de modo determinable que las elecciones generales se celebrarán en el día del "mes de noviembre" que determine la Asamblea Legislativa. Por su periodicidad, la fecha fijada por ley es un dato de conocimiento público y generalizado.

*Sexto*, contra la observancia de los preceptos constitucionales no pueden oponerse *escollos salvables* de tipo económico o burocráticos. Es menester mover los resortes de la maquinaria electoral en la consecución de tal fin. *P.S.P.* v. *Tribunal Electoral*, 104 D.P.R. 230 (1975). En la constelación de derechos fundamentales, el sufragio electoral goza de

preeminencia sobre inconvenientes administrativos o económicos superables.

Recapitulando, no es dable sostenerse la validez de la consulta de referéndum, si no se confiere a los "electores capacitados" la oportunidad de demostrar y acreditar tal condición una vez estén informados de ello. En consecuencia, resolvemos que todo referéndum especial bajo el Art. VII de la Constitución exige la celebración de una inscripción general para la inmatriculación de ciudadanos a los efectos de participación en dicho evento electoral. Tal conclusión —única armonizable en el marco conceptual, lenguaje y espíritu de la Constitución— se impone sin necesidad de buscar apoyo en jurisprudencia de otras jurisdicciones, independientemente de su respetabilidad.

No debemos olvidar que en el libre intercambio de ideas se apoya todo sistema democrático de gobierno. La historia alecciona que allí donde se cercena este derecho ha mediado previamente una crisis de sentido común.

¿Qué debe entenderse por crisis? "La crisis es un peculiar cambio histórico", nos dijo Ortega. Es un cambio que consiste "en que el mundo en que se vivía se ha venido abajo: el hombre queda sin sus convicciones anteriores; sin mundo. Es un cambio que comienza por ser negativo —crítico—. No se sabe que pensar de nuevo —sólo se sabe, o se cree saber que las ideas tradicionales son falsas, inadmisibles—. Se siente profundo desprecio por todo o casi todo lo que se creía ayer; pero la verdad es que no se tienen aún nuevas creencias positivas con qué sustituir las tradicionales. Como aquel sistema de convicciones o mundo era el plano que permitía al hombre andar con cierta seguridad entre las cosas y ahora carece de plano, el hombre se vuelve a sentir perdido, azorado, sin orientación". En las épocas críticas, el hombre "vive entre dos creencias, sin sentirse instalado en ninguna". Heras, *op. cit.*, pág. 177.

La libertad es como el agua: advertimos su necesidad cuando nos falta, pero, en exceso, nos ahoga. Sólo la moderación conforta el espíritu y aprovecha al cuerpo. La vitalidad

y funcionabilidad de nuestra Constitución no sujeta la voluntad creadora de la presente y futuras generaciones. Sin embargo, como sabia admonición, refleja que "[l]as constituciones deben estar fuera del alcance de la pasión súbita y el juicio pasajero y, siendo tal alto el fin que ellas cumplen, el procedimiento para enmendarlas debe ser lo suficientemente difícil como para invitar al análisis sereno y cuidadoso". *Diario, op. cit.*, pág. 2559.

El incumplimiento de los requisitos constitucionales en la implementación y preparación del referéndum —violando los derechos fundamentales de los demandantes— nos lleva a favorecer el interdicto decretado.