Opinión disidente emitida por la
Juez Asociada Señora Ro-dríguez Rodríguez.
“A line will take us hours maybe; Yet if it does not seem a moment’s thought, our stitching and unstit-ching has been naught”.
—W.B. Yeats, Adam’s Cursei[1])
Escribir una sentencia o una opinión de este Tribunal puede tomar horas o días de mucha investigación y razo-namiento, pero si el resultado al que se llega no alberga las exigencias de nuestra deontología profesional como garan-tes de los derechos de la ciudadanía, nuestra función como jueces se torna inútil. La sentencia que esta Curia emite hoy en el caso de autos representa un acto de descobijar a la ciudadanía de la protección contra actuaciones irrazona-bles y ultra vires de una agencia. Además, representa un intento de restringir la protección de la ciudadanía a su derecho al voto y a estar notificado con relación al proceso electoral que la Asamblea Legislativa estatuyó en el nuevo Código Electoral de Puerto Rico. Por entender que una ma-yoría de este Tribunal yerra en las interpretaciones de las disposiciones legislativas referentes al proceso de escruti-nio electrónico en las próximas elecciones generales de 2012, disiento de tal proceder.
I
Los hechos de este caso son sencillos, por lo que acoge-mos las determinaciones de hecho realizadas por el Tribu *548 nal de Primera Instancia, tal cual hace la Sentencia emi-tida por esta Curia. Véase Sentencia, págs. 21 — 22. Bien es sabido que en ausencia de pasión, prejuicio, parcialidad o error manifiesto, sostendremos la apreciación de la prueba y las determinaciones que realice el foro sentenciador. Pueblo v. Maisonave Rodríguez, 129 D.P.R. 49 (1991).
En síntesis, el aquí recurrido, Ledo. Luis Ricardo San-tini Gaudier, presentó una demanda de entredicho provisional, preliminar y permanente contra la Comisión Esta-tal de Elecciones (C.E.E.), por conducto de su Presidente, el Ledo. Héctor J. Conty Pérez, y contra los Comisionados Electorales que forman parte de la C.E.E. Adujo que la C.E.E. incumplió con el mandato expreso del Art. 3.015 del Código Electoral de Puerto Rico para el Siglo XXI (Código Electoral), Ley Núm. 78 de 1 de junio de 2011, según en-mendada, al no publicar una resolución concerniente a todo lo relacionado al escrutinio electrónico “con no menos de doce (12) meses de antelación a la fecha de una elección general”. Art. 3.015 del Código Electoral. Además, el recu-rrido expuso que la C.E.E. también incumplió con el requi-sito de notificación y publicidad de esa resolución al no exhibirla en todas las juntas de inscripción permanente, alcaldías y colecturías ni notificarla a los partidos, candi-datos independientes, organizaciones participantes ni pu-blicarla en dos periódicos de circulación general en el tér-mino de treinta días posterior a la aprobación de la resolución. ([2])
De todos estos reclamos, queremos enfocar nuestra atención al asunto medular de esta controversia. A saber, si con la Resolución CEE-RS-11-174 (Resolución Núm. 174) de 4 de noviembre de 2011, la C.E.E. cumplió o no con el requisito de ley de emitir con no menos de doce meses pre- *549 vio a la elección general de 6 de noviembre de 2012 una resolución con todo lo relacionado al escrutinio electrónico. De concluir, como demostraremos, que la C.E.E. incumplió con ese requisito, entonces analizar las otras exigencias de notificación y publicidad resultaría un ejercicio nimio, ba-ladí e inconsecuente. Si el eslabón original resulta defec-tuoso, los demás eslabones que se desprenden como conse-cuencia de éste, igual lo son. Examinemos a continuación la controversia planteada.
II
A
La Constitución de Puerto Rico consagra que “el sistema democrático es fundamental para la vida de la comunidad puertorriqueña ... [y] entendemos por sistema democrático aquel ... donde se asegura la libre participación del ciuda-dano en las decisiones colectivas”. (Enfasis suplido). Preámbulo, Const. P.R., L.P.R.A., Tomo 1, ed. 2008, pág. 266; Ortiz Angleró v. Barreto Pérez, 110 D.P.R. 84, 92 (1980) (“En el Preámbulo de nuestra Constitución se re-calca la importancia de la democracia para la vida de la comunidad puertorriqueña y lo fundamental del voto para la existencia de esa democracia”). Véase, además, McClintock v. Rivera Schatz, 171 D.P.R. 584, 597 (2007).
Como corolario de esa aspiración colectiva a una socie-dad democrática, la See. 2 de la Carta de Derechos de la Constitución establece que “[l]as leyes garantizarán la ex-presión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral”. Art. II, Sec. 2, Const. P.R., L.P.R.A., Tomo 1, ed. 2008, pág. 278. La importancia que reviste esa disposición constitucional la hemos reconocido históricamente en este Tribunal al expresar que el derecho al sufragio es una ga- *550 rantia fundamental que es consustancial con la existencia de una democracia política. P.N.P. v. De Castro Font II, 172 D.P.R. 883, 946 (2007); P.I.P. v. C.E.E., 120 D.P.R. 580 (1988); Giménez v. J.E.E., 96 D.P.R. 943, 947 (1968).
Esa importancia también se hace eco al reconocer en el derecho al sufragio una manifestación del derecho a la li-bertad de expresión. Ramírez de Ferrer v. Mari Brás, 144 D.P.R. 141, 204 (1997) (“sancionar a una persona por ejer-cer el derecho de su libertad de conciencia, privándolo del derecho al voto ... apareja una violación al derecho de expresión”. (J. Fuster Berlingeri, opinión mayoritaria) (“[a]l establecer el derecho al voto, la See. 2 del Art. II de nuestra Constitución lo entrelaza con su propósito ulterior: garantizar la expresión libre de la voluntad ciudadana” (J. Negrón García, opinión concurrente, Id., pág. 223).
El Tribunal Supremo de Estados Unidos también ha re-conocido la primacía del derecho al voto y su carácter como un derecho político fundamental según la Constitución de ese país. Véase, e.g., Illinois State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 184 (1979) (“Voting is of the most fundamental significance under our constitutional structure”); Reynolds v. Sims, 377 U.S. 533, 554-555 (1964) (“the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections. ... The right to vote freely for the candidate of one’s choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government”); Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886).
Ahora bien, ese derecho tan fundamental para nuestro sistema político es dejado en manos de la Asamblea Legis-lativa para que lo reglamente. La Constitución de Puerto Rico provee al respecto: “Se dispondrá por ley todo lo con-cerniente al proceso electoral y de inscripción de electores, así como lo relativo a los partidos políticos y candidaturas”. *551 Art. VI, Sec. 4, Const. P.R., L.P.R.A., Tomo 1, ed. 2008, pág. 425. Por lo tanto, “la facultad de la Asamblea Legislativa para regular el proceso electoral así como los partidos, tiene una insoslayable dimensión constitucional”. McClintock v. Rivera Schatz, supra, pág. 598.
Sin embargo, ese poder no es absoluto, puesto que se halla limitado por otros derechos de carácter fundamental, garantizados por la propia Constitución. RR.R v. E.L.A., 115 D.P.R. 631, 636-637 (1984); P.S.P., P.P.D., P.I.P. v. Romero Barceló, 110 D.P.R. 248, 256 — 257 (1980). Por ello es que el sufragio, como expresión individual y colectiva, ocupa un sitial de primerísimo orden que obliga a los tribunales a conferirle la máxima protección. Suárez v. C.E.E. I, 163 D.P.R. 347, 355 (2004). En el ejercicio de esa protección es que los tribunales venimos llamados a ejercer nuestro poder de revisión contra actuaciones del Estado que interfieran con los procesos democráticos.([3]) Véase Ortiz Angleró v. Barreto Pérez, 110 D.P.R. 84, 88 (1980); citando a J.H. Ely, Democracy and Distrust: A Theory of Judicial Review, Cambridge, Harvard U. Press, 1980, pág. 117 (“unblocking stoppages in the democratic process is what judicial review ought preeminently to be about”).
B
El 1 de junio de 2011, la Asamblea Legislativa promulgó el nuevo Código Electoral al amparo del deber constitucio-nal de regular los procesos electorales. Con ello se reafirmó “el principio de que los propósitos de existencia de un or-denamiento electoral descansan en unas garantías de pu-reza procesal capaces de contar cada voto en la forma y *552 manera en que sea emitido”. (Énfasis suplido). Art. 2.002 del Código Electoral. En la Exposición de Motivos del Código Electoral se mencionó que “esta medida busca fortalecer el sistema democrático de la Isla, ampliar derechos a los electores, así como reducir al mínimo la intervención de elementos ajenos al proceso electoral con la voluntad del electorado”. (Énfasis suplido). Id. (Exposición de Motivos).
En el Art. 3.015 del Código Electoral se preceptuó lo concerniente a la controversia de autos. Allí se estableció:
La Comisión determinará mediante resolución, la forma del proceso de votación electrónica o escrutinio electrónico a ser usado en todos los colegios electorales. El elector tendrá pose-sión y control de la o las papeletas por él votadas, ya sean electrónicas o de papel, hasta que mediante su interacción directa con la máquina de votación o escrutinio electrónico sus votos hayan sido debidamente registrados y sus papeletas guardadas en una urna electrónica o convencional. La Comi-sión notificará a la ciudadanía con no menos de doce (12) meses de antelación a la fecha de una elección general todo lo rela-cionado a la votación electrónica o escrutinio electrónico. (En-fasis suplido).
Además del Art. 3.015, el Código Electoral posee otras disposiciones relacionadas al escrutinio electrónico y que resultan pertinentes a esta controversia: los Arts. 3.002(o) y 9.011. Estos artículos establecen que el elector manten-drá total control de su papeleta e interactuará directamente con el dispositivo electrónico de escrutinio.
A su vez, el Informe sobre el Sustitutivo de la Cámara al P. de la C. 1863, emitido el 10 de noviembre de 2010 por la Comisión Especial de Reforma Gubernamental del Senado de Puerto Rico, 16ta Asamblea Legislativa, 4ta Sesión Or-dinaria, expresa que con el proceso de escrutinio electró-nico habrá que asegurarse “de que el elector sea quien tenga el control de su papeleta”. (Énfasis suplido). Comi-sión Especial de Reforma Gubernamental del Senado, In-forme sobre el Sustitutivo de la Cámara al P. de la C. 1863, págs. 19 y 23. Vemos, pues, una intención legislativa de *553 proteger el voto del elector exigiendo que cada elector tenga control de su voto y acceso directo a las máquinas de escrutinio.
Posterior a la aprobación del Código Electoral, el 3 de junio de 2011 se aprobó la Resolución Conjunta Núm. 44, en donde se ordenó a la C.E.E. a implantar el sistema de escrutinio electrónico durante los comicios de 2012. Las Secs. 1 y 2 de la Resolución Conjunta Núm. 44, págs. 2-3, dispusieron, en lo pertinente:
a. Se utilizará un sistema de escrutinio electrónico, conocido como Optical Scanning System (OpScan). Este mecanismo consistirá de un lector óptico y una urna en la cual serán depositad [o] s las papeletas y el voto se llevará a cabo mediante la interacción directa del elector con la máquina de escrutinio electrónico.
b. El sistema deberá conservar evidencia física del voto que emitió el elector y que permita su posterior cotejo en un escru-tinio o recuento.
c. La Comisión Estatal de Elecciones utilizará las últimas Guías Voluntarias, según adoptadas por la Election Assistance Commission (EAC), para asegurar que al finalizar el proceso electoral electrónico, la Comisión Estatal de Elecciones haya cumplido con las guías mínimas establecidas por el Gobierno de los Estados Unidos de América a través de la Ley HAVA (Help America Vote Act) de 2002, según enmendada.
d. El sistema de escrutinio electrónico deberá estar previa-mente certificado en cumplimiento con los estándares más re-cientes, según adoptados por la Federal Election Commission o por la Election Assistance Commission (EAC), cuales están-dares sean más recientes al momento en que la Comisión Es-tatal de Elecciones adjudique la licitación para adquisición de las máquinas de escrutinio electrónico. El sistema debe estar certificado para garantizar las ventajas significativas en el proceso de escrutinio, en términos del ahorro en tiempo y la precisión del proceso de adjudicación.
e. El sistema deberá facilitar la participación para los elec-tores con impedimentos en cumplimiento con la Ley HAVA, in-cluyendo, pero sin limitarse, al desarrollo de sistemas de re-gistro electrónico, Poll Book, o cualquier otro apoyo electrónico existente.
... [L]a Comisión Estatal de Elecciones establecerá en la re- *554 glamentación pertinente los estatutos y parámetros para lle-var a cabo programas de educación masiva y campaña de orientación dirigida a los electores sobre el sistema de escru-tinio electrónico en fecha que no será menos de seis (6) meses antes del evento electoral. (Enfasis suplido).
Tras intentos fallidos de la C.E.E. por establecer los pa-rámetros del proceso de escrutinio electrónico, el 4 de no-viembre de 2011 ésta aprobó la Resolución Núm. 174. De una lectura de esa resolución y del recurso de Certificación que la C.E.E. presentó ante esta Curia, se desprende que la Resolución Núm. 174 se emitió con el propósito de cum-plir con el requisito procesal de emitir algo antes de la fecha de 6 de noviembre de 2011, pero sin atender la sus-tancia de éste.([4]) Citamos la referida resolución:
... [T]oda vez que la Junta de Subastas de la C.E.E. decretó desierta la Subasta Formal ... para la adquisición del sistema de escrutinio electrónico, la Comisión se encuentra en el pro-ceso de seleccionar la compañía con la que contratará la pro-ducción del referido sistema. Sin embargo, de conformidad con el Artículo 3.015 del Código Electoral de Puerto Rico para el Siglo XXI ... la (C.E.E.) le notifica a la ciudadanía que utili-zará un sistema de escrutinio electrónico, conocido como Optical Scanning System (OpScan), durante la elección general del 6 de noviembre de 2012, según ordenado por la ... Resolución Conjunta Núm. 44.
Los electores continuarán votando mediante una marca en pa-peleta de papel. Sin embargo, ... se contarán los votos utili-zando un sistema de escrutinio electrónico que consistirá de un lector óptico, una urna en la cual serán depositadas las papeletas y el voto se llevará a cabo mediante una interacción directa del elector con la máquina de escrutinio electrónico. El sistema de escrutinio electrónico garantizará que el elector ejercerá su derecho al voto de forma privada e independiente, y que cada sufragio se cuente en la forma en que fue votado. El sistema de escrutinio electrónico le notificará al elector si ha emitido un voto válido, y le dará la oportunidad de corregir *555 cualquier error en la papeleta que de otra forma invalide su voto. Luego de ser contadas por el lector óptico, las papeletas serán depositadas en una urna que estará adherida a la má-quina de escrutinio que asegurará y protegerá las papeletas votadas como evidencia verificable de los votos emitidos en casos de escrutinio o recuento manual.
La [C.E.E.] promulgará la reglamentación necesaria para llevar a cabo un programa de educación masiva y campaña de orientación dirigida a los electores sobre el sistema de escru-tinio electrónico por lo menos seis (6) meses antes de las elec-ciones generales del 6 de noviembre de 2012. Resolución de Aviso de Sistema de Votación, Sistema de Escrutinio Electró-nico Conocido como Optical Scanning System (OpScan), CEE-RS-11-174, 4 de noviembre de 2011. Apéndice, pág. 121.
Aunque prolijo, estimamos necesario presentar un ex-tracto de los tres documentos mencionados (Art. 3.015 del Código Electoral, Resolución Conjunta Núm. 44 y Resolu-ción Núm. 174) para una mejor comprensión de lo que dis-cutiremos a continuación.
III
A
Reconocemos que el Art. 3.015 del Código Electoral con-tiene un mandato hacia la C.E.E. que goza de dos caracte-rísticas: (1) expreso y (2) vago o impreciso. Como indicamos anteriormente, ese mandato es: notificar “todo lo relacio-nado” al escrutinio electrónico.
Trazar una teoría sobre la naturaleza y constitución del vocablo todo resultaría tan fútil como descifrar el signifi-cado transcendental de esa misma palabra. No es nuestra función entrar en consideraciones epistemológicas sobre el todo o la nada en el lenguaje. No nos corresponde a los tribunales elucubrar sobre la metafísica del lenguaje, sino realizar interpretaciones plausibles, integradas a los pro-pósitos legislativos y razonables en pos del bienestar social. “When those trained in the respective disciplines of medicine, philosophy, and theology are unable to arrive at any consensus, the judiciary, at this point in the develop *556 ment of man’s knowledge, is not in a position to speculate as to the answer”. Roe v. Wade, 410 U.S. 113, 159 (1973).
Al enfrentarnos al Art. 3.015 del Código Electoral y rea-lizar un examen de hermenéutica sobre el significado de la palabra todo en ese contexto, no podemos dejar a un lado la sensatez. Ergo, no es nuestra pretensión que se incluya en la Resolución Núm. 174 hasta lo inimaginable o hacer de ella una especie de holograma o aleph jurídico. Todo lo con-trario, el todo del Art. 3.015 del Código Electoral es una entidad amorfa que debemos ahora rellenar de significado cónsono con la intención legislativa y con aquello que sea razonable para lograr los propósitos para los que se aprobó dicho artículo.([5]) Véase Matos v. Junta Examinadora, 165 D.RR. 741, 748-749 (2005) (“Resulta necesario que en nuestra interpretación armonicemos, hasta donde sea po-sible, todas las disposiciones de la ley con el propósito de lograr una interpretación integrada, lógica y razonable de la intención legislativa”).
Para ello el propio Código Civil nos brinda unas herra-mientas de interpretación estatutaria. Dispone que “[l]as palabras de una ley deben ser generalmente entendidas en su más corriente y usual significación, sin atender dema-siado al rigor de las reglas gramaticales, sino al uso general y popular de las voces”. Art. 15 del Código Civil de P.R., *557 31 L.P.R.A. sec. 15. Por otra parte, el Código Civil también comenta: “Cuando las palabras de una ley son dudosas, su sentido debe ser buscado por el examen y comparación de las frases dudosas con otras palabras y sentencias que les estén relacionadas, en el orden de una buena investiga-ción, para llegar a su verdadero significado”. Art. 17 del Código Civil de P.R., 31 L.P.R.A. sec. 17. De haber dos o más leyes sobre el mismo asunto, entonces se aplica la in-terpretación codificada en el Art. 18 del Código Civil: la interpretación debe realizase refiriendo unas leyes con otras, por cuanto lo que es claro en una ley puede usarse para explicar lo dudoso en la otra ley. 31 L.P.R.A. sec. 18.
Así, pues, debemos analizar el Art. 3.015 del Código Electoral en conjunto con la Resolución Conjunta Núm. 44, puesto que ésta tiene fuerza de ley. Véanse: 2 L.P.R.A. see. 200; C.R.I.M. v. Méndez Torres, 174 D.P.R. 216, 229 (2008); Noriega v. Hernández Colón, 135 D.P.R. 406, 450 (1994) (donde se expresa que las resoluciones conjuntas tienen fuerza de ley). Al analizar ambas disposiciones legislativas, notamos que se complementan y que no son excluyentes.
La Resolución Conjunta Núm. 44 no define el contenido de la resolución que debía emitir la C.E.E. al menos doce meses previo a las elecciones ni detalla qué incluirá la frase “todo lo relacionado”. Entre otras cosas, lo que hace es atender una omisión del Art. 3.015 del Código Electoral sobre el proceso de educación masiva y campaña de orien-tación, y le provee un término distinto al del Art. 3.015 para cumplir con esos objetivos. En otras palabras, el tér-mino de seis meses de la Resolución Conjunta Núm. 44 es para redactar y emitir un reglamento de índole administra-tivo sobre la campaña de educación y orientación sobre el proceso de escrutinio electrónico. Ese término de seis me-ses no aplica al término para que la C.E.E. notifique a la ciudadanía los detalles en sí del sistema de escrutinio electrónico. El término de doce meses del Art. 3.015 es para notificar, mediante un mecanismo que no sea de la natura- *558 leza de un reglamento, todo lo relacionado al escrutinio electrónico. En la notificación de los doce meses, previo a las elecciones, no se tiene que indicar cómo será la educa-ción masiva y campaña de orientación, sino solo explicar cómo será el proceso.
A pesar de los postulados sobre la interpretación esta-tutaria que provee el Código Civil, la sentencia adoptada por la mayoría de este Tribunal colige erradamente que la finalidad legislativa mediante la aprobación de la Resolu-ción Conjunta Núm. 44 fue sustituir el término de notifi-cación de doce meses, previo a una elección, por un término menor de seis meses. Así, la sentencia le da carácter en-mendador a una resolución conjunta sobre una ley, sin ex-plicación jurídica alguna que sustente esa conclusión. Bien sabemos que:
Toda resolución conjunta sigue el mismo trámite de un pro-yecto de ley para su aprobación. Ambos instrumentos tienen la misma fuerza de ley y obligan por igual a la ciudadanía y al Estado a su cumplimiento. La diferencia entre un proyecto de ley y una resolución conjunta estriba en que el primero en-vuelve medidas de carácter permanente y su vigencia es ilimi-tada una vez convertido en ley. Mientras que la resolución conjunta es de carácter transitorio, por lo que su vigencia cesa tan pronto se cumple el propósito que la originó”. N. Rigual, El poder legislativo de Puerto Rico, San Juan, Ed. U.P.R., 1961, págs. 95-96.
En el trigésimo primer día de sesión de la Convención Constituyente se desarrolló una discusión en torno a la aprobación de la disposición constitucional sobre las reso-luciones conjuntas.([6]) Allí, el delegado señor Reyes Delgado propuso que se enmendara el texto propuesto para que le-yera “La Asamblea Legislativa determinará, por ley, los asuntos especiales”. (Enfasis suplido). 2 Diario de Sesiones *559 de la Convención Constituyente 857 (1951) Argumentó el señor Reyes Delgado:
El propósito de esta enmienda es el siguiente: La Asamblea Legislativa puede decretar, por ley, que se puedan enmendar los códigos mediante resolución conjunta; que puedan hacerse, decretarse leyes de carácter general, mediante resolución con-junta [pero] la resolución conjunta no es otra cosa que una manera de legislar sobre asuntos de carácter especial.
... [.P]ero que nunca se pueda entender que la Asamblea Le-gislativa pueda enmendar los códigos y leyes de carácter general, a virtud de resoluciones conjuntas. (Enfasis suplido). Id.
A esa intervención replicó el delegado señor Negrón Ló-pez, Presidente de la Comisión de la Rama Legislativa, por entender que la enmienda propuesta era innecesaria por-que la naturaleza misma de las resoluciones conjuntas es que serán utilizadas para asuntos especiales.!([7]) A pesar de ello, se mostró conforme con las expresiones antes trans-critas del señor Reyes Delgado. Expresó el señor Negrón López:
[P]ara lograr el mismo propósito fue que nosotros establecimos en nuestra recomendación, la Comisión de la Rama Legisla-tiva, que no haya ninguna otra especialidad que la que la Asamblea Legislativa determine por ley para legislar por re-solución conjunta, persiguiendo los mismos propósitos que tiene en mente el señor Reyes Delgado, pero sin dejar el germen del tecnicismo en el estatuto constitucional.
Por esas razones es que entiendo que no debemos aprobar la enmienda que propone el Sr. Reyes Delgado, aunque estoy de acuerdo con el propósito que la informa. (Enfasis suplido). Id., pág. 858.
Lo anterior es diáfano en cuanto al rechazo de que las resoluciones conjuntas tienen el poder de enmendar leyes. *560 Si las resoluciones conjuntas tienen una duración limitada y un propósito específico, no podemos concluir que éstas tienen el poder de enmendar una ley permanente y de du-ración ilimitada. La Resolución Conjunta Núm. 44 no ex-presó en ningún momento que se estaba enmendando o derogando parte del Código Electoral ni tampoco se puede inferir que lo haya hecho tácitamente. Art. 6 del Código Civil de P.R., 31 L.P.R.A. see. 6 (la derogación de una ley puede ser tácita cuando contiene nuevos preceptos contra-rios o irreconciliables con la ley anterior). Yerra este Tribunal con esa interpretación, pues ambas expresiones legis-lativas se complementan porque versan sobre la misma materia (escrutinio electrónico), pero atienden asuntos diferentes y con términos independientes. Recapitulamos, el término de doce meses es para dar una notificación preli-minar del sistema de escrutinio,([8]) mientras que el término de seis meses atiende solo la campaña de orientación o de educación masiva sobre cómo será el proceso.
B
Después de analizar el Art. 3.015 del Código Electoral frente a la Resolución Conjunta Núm. 44, pasemos ahora a analizar ambos frente a la Resolución Núm. 174 de la C.E.E. De las disposiciones legislativas se desprenden dos requisitos para la Resolución Núm. 174. Uno es sustantivo y el otro es procesal. El primero va intrínsecamente atado al acápite anterior en donde expresamos que no hay que incluir en la palabra “todo” hasta lo inimaginable, sino lo objetivamente necesario para cumplir con la intención le-gislativa y brindar una “garantí[a] de pureza procesal *561 [capaz] de contar cada voto en la forma y manera en que sea emitido”. Art. 2.002 del Código Electoral. El segundo requisito, el procesal, atiende el asunto temporal y fue pre-cisamente el que quiso atender la C.E.E.([9]) Ambos están estrechamente ligados, pero el incumplimiento con el re-quisito sustantivo supone ipso facto el incumplimiento ju-rídico con el procesal. Por ello nos enfocaremos en evaluar el requisito sustantivo.
Queremos comenzar por hacer una radiografía de la Re-solución Núm. 174 para demostrar que ésta no aportó nada al conocimiento público de lo que la Asamblea Legislativa ya había dispuesto en el Art. 3.015 del Código Electoral y en la Resolución Conjunta Núm. 44. En la tabla a conti-nuación expondremos en la primera columna lo que dis-pone la Resolución Núm. 174 y en las otras dos columnas marcaremos con una equis cuando esa disposición pro-venga del Código Electoral o la Resolución Conjunta Núm. 44:
[[Image here]]
*562 [[Image here]]
Como se puede apreciar, la Resolución Núm. 174 lo que hace es recopilar lo ya dispuesto previamente por la Asam-blea Legislativa, por lo que realmente no determina ni no-tifica todo lo relacionado a la forma del proceso de votación electrónica o escrutinio electrónico. Si lo dispuesto por la Asamblea Legislativa constituyere todo lo relacionado al sistema de escrutinio electrónico, ¿qué sentido tendría exi-girle a la C.E.E. que notifique a la ciudadanía lo concer- *563 mente a ese proceso? Además, partiendo de la teoría de la delegación de poderes a las agencias gubernamentales, la Asamblea Legislativa no tiene pericia sobre el asunto, por lo que es razonable pensar que lo dispuesto en el Código Electoral y la Resolución Conjunta Núm. 44 no puede cons-tituir todo lo relacionado al proceso. ¿Si no lo constituye en los propios textos de la ley, lo podría constituir en una re-solución de la agencia? Esto, diáfanamente, raya en lo ilógico.
Si la intención de la Asamblea Legislativa hubiese sido que la C.E.E. copiara ad verbatim lo ya dispuesto legisla-tivamente, no le hubiese requerido a la C.E.E. el término de doce meses antes de las elecciones generales, puesto que la información, ya estaba notificada. Lo adoptado por la C.E.E. en la Resolución Núm. 174 no constituye una noti-ficación con los requerimientos del Art. 3.015 en la medida en que lo que se adoptó en esa resolución ya estaba notifi-cado en la propia ley.
Con lo discutido previamente examinamos qué no signi-fica todo lo relacionado. Ahora, pasemos a auscultar qué sí puede o debe incluir la frase en cuestión. Así veremos que el incumplimiento sustantivo de la C.E.E. fue doble: por un lado incluyó bajo el todo lo no debido y, por el otro, obvió lo necesario. Para cumplir con este objetivo debemos explicar qué tipos de sistemas de votación hay, en qué consiste el sistema de escrutinio electrónico y qué información es ne-cesaria para que la ciudadanía se sienta debidamente no-tificada y pueda confiar en el andamiaje electoral y la ma-quinaria que ha de utilizarse. Véase Granados v. Rodríguez Estrada I, 124 D.P.R. 1 (1989).
Estudiosos de temas electorales identifican cinco formas o tecnologías de emitir el sufragio. Señala Eric A. Fischer([10]) que estas son: “paper ballots, lever machines, pun- *564 chcards, marksense forms, and electronic systems”. E.A. Fischer, Voting Technologies in the United States: Overview and Issues for Congress, pág. 1 (2001), http://usa. usembassy.de/etexts/crights/reports/votetech.pdf Véase, además, D.P. Tokaji, The Paperless Chase: Electronic Voting and Democratic Values, 73 Fordham L. Rev. 1711, 1717-1718 (2005). El seleccionado por la Asamblea Legis-lativa en el Código Electoral y la Resolución Conjunta Núm. 44 es el marksense u optical scan, en donde los elec-tores:
... [M]ake their choices by using a pencil or pen to mark the ballot, typically by filling in an oval or drawing a straight line to connect two parts of an arrow. The ballots are counted by scanners, which may be located either at the precinct (in “precinct-count” systems) or at some central location (“central-count” systems). (Escolio omitido). Tokaji, supra, pág. 1722.
Este sistema de lente óptico puede representar tres ti-pos de errores: overvote (se vota por más de los candidatos permitidos), undervote (se vota por menos de los candida-tos permitidos) o unintended vote (se vota inadvertidamente por el candidato no deseado). Fischer, supra, pág. 8.([11]) No obstante, esos errores son corregibles mediante un proceso que forma parte del mismo sistema. El problema que salta a la vista es que habiendo dos tipos de sistemas OpScan, el “central-count optical scan” y el “precint-count optical scan”, la corrección del error en la papeleta va a ser diferente. Comenta Fischer: “With marksense systems where tabulation is done at the precinct, ballots may be *565 checked by the tabulator for some kinds of error before being submitted. However, marksense systems where tabulation is done at a central location do not permit such machine-assisted error correction”. (Enfasis suplido). Id., pág. 9.
Otro asunto con los errores durante la votación es que “[t]he incidence of errors may also depend on the condition of voting equipment and the demographics of the voting population”, (énfasis suplido) id., pág. 9. Véase Tokaji, supra, págs. 1744-1747. Teniendo en cuenta la pluralidad de ciudadanos que participan en los comicios electorales, desde personas duchas en asuntos tecnológicos hasta per-sonas a quienes les cuesta más tiempo y esfuerzo adap-tarse a éstos, este dato nos resulta de mucha importancia.
Notamos, pues, que el sistema tiene unos detalles im-portantes que deben conocerse y notificársele a la ciudadanía. Sin embargo, la Resolución Núm. 174 obvia éstos, como por ejemplo:
1. La compañía contratada para realizar el escrutinio electrónico.
2. El tipo de máquinas que han de utilizarse: “central-count optical scan” o “precint-count optical scan”.
3. El software o sistema que usarán las máquinas.
4. Detalles sobre la probabilidad de manipulación de la información registrada en la máquina.
5. El porciento de margen de error del escrutinio.
6. El procedimiento de votación de las personas con necesidades especiales (con impedimentos).([12])
7. Las ayudas que se brindarán a personas de edad avanzada a quienes les resulte difícil el proceso.([13])
*566 8. La manera de escrutar electrónicamente los votos por nominación directa (write-in).
9. La forma como se realizará el escrutinio en aquellos casos de votos ausentes y votos adelantados. No olvidemos que una de las garantías del derecho al voto recogidas en el Código Electoral es que cada voto “se cuente y se adjudique de la manera en que el elector lo emita”. Art. 6.001(10) del Código Electoral.([14])
10. La manera como los electores que ejerzan su voto ausente podrán corregir errores en sus papeletas, si es que pueden. Si no pueden realizar la corrección, igualmente habría que notificarlo, aunque ello violaría la disposición de ley de que cada elector tendrá interacción directa con la máquina de escrutinio (Resolución Conjunta Núm. 44).
La ausencia de estos detalles en la Resolución Núm. 174, evidentemente causa incertidumbre e inseguridad, principalmente en aquellos electores con necesidades espe-ciales o electores ausentes o de voto adelantado, quienes se ven directamente afectados en su derecho al sufragio. Cuando al voto de un ciudadano no se le da el mismo peso que al voto de otro ciudadano, se configura una violación al derecho de sufragio como si le hubieran negado el libre ejercicio de emitir su voto. Véase Bush v. Gore, 531 U.S. 98 (2000).
Con la ausencia de información imprescindible en la Re-solución Núm. 174, como información relativa al voto de personas con necesidades especiales, votos adelantados y votos ausentes, se resta el valor o el peso del de aquellas personas incluidas en esas clasificaciones. Esto, cierta-mente, constituye una violación al derecho al sufragio de esas personas y al derecho a la igual protección de las leyes.
La sentencia emitida por este Tribunal indica que el Tri *567 bunal de Primera Instancia “impuso a la C.E.E. requisitos adicionales a los contemplados por el Código Electoral y la Resolución Conjunta Núm. 44”. Sentencia, pág. 540. En efecto, ante la vaguedad e imprecisión del Código Electoral y la Resolución Conjunta Núm. 44 en cuanto al contenido de la resolución a emitirse a más tardar un año antes de las elecciones, el foro de instancia interpretó correcta-mente la disposición legislativa de la manera más favorable para salvaguardar el derecho al sufragio de todo ciudadano. “[A]nte cualquier posible vaguedad o laguna en las disposiciones estatutarias o reglamentarias que regu-lan el ejercicio al voto, la interpretación adoptada debe dar primacía a la máxima protección de la expresión electoral”. (Énfasis suplido). Suárez v. C.E.E. I, 163 D.P.R. 347, 355 (2004). Ante esa vaguedad, procede que protejamos el de-recho al voto de todos los electores hábiles en Puerto Rico, garantizándoles un ambiente de certidumbre, tranquili-dad, seguridad y confianza en el proceso electoral.
Por otra parte, la Sentencia emitida hoy comenta que los requisitos impuestos por el Tribunal de Primera Ins-tancia van dirigidos a “aspectos técnicos” que en nada afec-tan el derecho al sufragio. Sentencia, pág. 540. ¿Acaso ob-viar lo concerniente a cómo las personas con necesidades especiales o las personas que emitirían su voto adelantado o ausente constituye “aspectos técnicos que en nada afectan el derecho de la ciudadanía con relación a su sufragio”? ¿Querrá decir una mayoría de este Tribunal que las perso-nas con necesidades especiales carecen de consideración o que sus votos no tienen el mismo valor que el de cualquier otro ciudadano? ¿Igual con las personas que emitan voto adelantado o ausente? ¿O quizás quiere decir la mayoría que el valor de esas personas como ciudadanos aptos para votar se reduce a “aspectos técnicos” que no afectan al resto de la ciudadanía? Es lamentable, por no decir trágico, que desde esta Curia se expresen esas aseveraciones. El Tribunal de Primera Instancia tuvo ante sí toda la evidencia que *568 desfiló en este caso y ante el balance de intereses entre buscar mayor agilidad para el proceso de votación vis-á-vis al alto interés público de proteger el derecho al sufragio y garantizar que el elector emita un voto informado, el tribunal a quo ejerció correctamente su discreción de prote-ger el derecho al voto.
IV
A
En nuestra jurisdicción es sabido que las agencias gu-bernamentales son creadas por ley y, en lo subsiguiente, se rigen por su ley orgánica. “El estatuto orgánico o ley habi-litadora de una agencia es lo que ‘define y delimita’ la ex-tensión de la jurisdicción de la agencia. ... ‘Cualquier transgresión a lo pautado por la ley [habilitadora de la agencia] respecto a los linderos de acción constituye una acción ilícita. Se considera que dicha actuación ha sido efectuada sin autoridad’ ”. Perfect Cleaning v. Cardiovascular, 162 D.P.R. 745, 758-759 (2004) (citando a D. Fernández Quiñones, Derecho administrativo y Ley de Proce-dimiento Administrativo Uniforme, 2da ed., Colombia, Ed. Forum, 2001, pág. 131).
Teniendo en cuenta que la C.E.E. fue creada por virtud del art. 3.001 del Código Electoral, es razonable concluir que este constituye la ley orgánica que rige los linderos de acción permitida de la C.E.E. y delimita la extensión de jurisdicción de ese organismo administrativo. Perfect Cleaning v. Cardiovascular, 162 D.P.R. 745 (2004). Así, pues, cualquier actuación de la C.E.E. que no obedezca el poder que le fue conferido mediante su ley habilitadora debe ser catalogada ultra vires. DACo v. AFSCME, 185 D.P.R. 1 (2012). Todos los actos u órdenes ejecutados por la agencia que se extralimitan de lo dispuesto en la ley habilitadora son erróneos y nulos. Id. Por tal motivo, toda ac- *569 tuación de la C.E.E. referente al proceso de implantación del escrutinio electrónico que fuera posterior al incumpli-miento de la Resolución Núm. 174 con los requisitos del Art. 3.015 del Código Electoral, es ultra vires.
El incumplimiento sustantivo y procesal de la Resolu-ción Núm. 174 con el mandato expreso del Código Electoral, constituye claramente un error insubsanable. Esto, pues es inconcebible cumplir con el término de no menos de doce meses con antelación a una elección, cuando apenas estamos a cerca de seis meses previo a los comicios de 6 de noviembre de 2012.([15]) Ese error, no obstante, no deja sin efecto la política pública implantada en el Código Electoral, a los efectos de que se introducirán nuevas tecnologías electrónicas a los procesos electorales en Puerto Rico.([16]) Por ello el error insubsanable para las elecciones del 2012 no releva a la C.E.E. de su deber de realizar las gestiones correspondientes para implantar el escrutinio electrónico en futuros eventos electorales.
Debido a la naturaleza limitada y específica de la Reso-lución Conjunta Núm. 44, este error insubsanable de la C.E.E. sí deja sin efecto ese mandato legislativo. Ello, em-pero, no afecta la política pública del Código Electoral, puesto que lo estatuido en la Resolución Conjunta Núm. 44 tendrá vigencia solo hasta el 6 de noviembre de 2012. 2 L.P.R.A. see. 200; Op. Sec. Just. Núm. 11 de 1973. Cabe mencionar que la propia C.E.E., y acogido con aprobación por la sentencia que hoy se emite, págs. 20-21, adelanta en su recurso de certificación la posibilidad de incumplir con *570 el mandato legislativo de la Resolución Conjunta Núm. 44. Señala la C.E.E. que el hecho de proseguir con el proceso de negociación con la compañía seleccionada, “no quiere decir de modo alguno que la C.E.E. proseguirá con su im-plantación si alberga alguna duda en cuanto a su funcionamiento”.![17]) Vemos que decretar el error de la C.E.E. como insubsanable, plantea el mismo escenario al que la C.E.E. y una mayoría de este Foro están dispuestos a acudir: el incumplimiento con el mandato legislativo re-cogido en la Resolución Conjunta Núm. 44.
B
La sentencia emitida por esta Curia dice que el daño del recurrido es especulativo y a destiempo. La mayoría del Tribunal se contradice al concluir, por un lado, que los da-ños del recurrido son especulativos y a destiempo, mien-tras que, por el otro lado, procede a brindarle deferencia a las determinaciones de hecho del foro de instancia.([18]) Esto, evidentemente, resulta una contradicción si se tiene en cuenta que en la determinación de hecho número 56 el Tribunal de Primera Instancia, tras varias vistas evidencia-rías, dio por probado que el demandante sufre un daño como elector porque la falta de información sobre el pro-ceso de escrutinio electrónico produce desconfianza, inse-guridad, incertidumbre sobre el proceso en sí, además que *571 promueve falta de entusiasmo en los electores en partici-par en las elecciones.([19]) Sentencia T.P.I., pág. 26.
Debemos destacar que el Art. 6.001 del Código Electoral reconoce el derecho del elector a emitir libremente su voto y a que éste se adjudique de la manera en que el elector lo emita. Ese artículo, a su vez, le reconoce a todo elector la capacidad para “iniciar o promover cualesquiera acciones legales al amparo de esta Declaración de Derechos y Pre-rrogativas de los Electores ante el Tribunal de Primera Instancia”. Art. 6.001 del Código Electoral. Visto que el re-clamo del recurrente es en torno a una violación actual a ese derecho estatutario y constitucional, yerra el Tribunal al tildar de especulativo y a destiempo el daño reclamado.
V
Finalmente, huelga decir que nuestra función desde la judicatura es proteger los derechos de la ciudadanía, par-ticularmente el derecho al voto aquí en controversia, contra actuaciones interventoras e irrazonables del Estado. Ortiz Angleró v. Barreto Pérez, 110 D.P.R. 84 (1980). No nos corresponde realizar un juicio moral sobre los beneficios o perjuicios del proceso de escrutinio electrónico. Es nuestra responsabilidad como jueces de esta Curia velar por los derechos de toda la ciudadanía, irrespectivamente de nuestros posicionamientos personales en torno a la medida que intenta implementar el Estado. Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 850 (1992) (“Our obligation is to define the liberty of all, not to mandate our own moral code”).
Si bien puede ser muy encomiable aunar esfuerzos para aspirar a un sistema que agilice y modernice nuestros pro- *572 cesos electorales, ello debe ser en armonía con salvaguar-dar un derecho tan preciado como el sufragio, mas no a costa de éste. Es por estas razones que ante el proceder que hoy asume una mayoría de este Tribunal, respetuosamente disiento.

(1) “Un solo verso puede exigir muchas horas; pero si no parece el don de un momento, nuestro tejer y nuestro destejer son inútiles”, traducción de Jorge Luis Borges, “Miguel de Cervantes: Novelas ejemplares”, en Prólogos con un prólogo de prólogos (1975).

(2) El Tribunal de Primera Instancia acogió como estipulación de hecho número cuatro y cinco que la Resolución CEE-RS-11-174 se publicó en dos periódicos de circulación general los días 6 y 13 de noviembre de 2011.

(3) Teniendo en cuenta la envergadura del derecho al sufragio en nuestro sis-tema democrático, la protección a este derecho constitucional satisface la excepción a la norma general de la Ley Antiinjunction. Art. 678 del Código de Enjuiciamiento Civil, 32 L.P.R.A. see. 3524.

(4) Admite la peticionaria: “la C.E.E. está obligada por el Artículo 3.015 del Código Electoral y por la R.C. 44 a implantar un sistema de escrutinio electrónico en las Elecciones Generales del 6 de noviembre de 2012 independientemente de la forma en que el mismo le sea notificado a la ciudadanía.” (Énfasis en el original). Recurso de Certificación de la C.E.E., pág. 23.

(5) Del Diario de Sesiones del Senado, de 10 de noviembre de 2010, se desprende la discusión habida en torno a la aprobación del Sustitutivo de la Cámara de Repre-sentantes al P. de la C. 1863, posteriormente convertido en el Código Electoral actual. Allí la Sra. señora Nolasco Santiago, quien fungía como vicepresidenta del Senado y presidenta de la Comisión Conjunta Especial que realizó los trabajos legis-lativos concernientes al nuevo Código Electoral, expresó:
“Las características principales [del nuevo Código Electoral], la principal es que está centrado en el elector. Nosotros no tenemos que buscar el bienestar de otras cosas, lo que tenemos es que buscar el bienestar del elector.
“El nuevo Código Electoral ordena a la Comisión implantar un sistema de vo-tación y escrutinio electrónico donde el elector va a interactuar con la máquina de votación. No es que yo voy a coger mis papeletas, voy a votar y las voy a echar en una urna para que luego otras personas las saquen de una urna y las van a contar, eso se acabó. ... [U]na vez yo cojo mis papeletas, nadie más las toca hasta que son contadas, y eso definitivamente nos tiene que dar una seguridad”. Diario de Sesiones del Se-nado, 10 de noviembre de 2010, págs. 24058-24060.

(6) “Se determinará por ley los asuntos que puedan ser objeto de consideración mediante resolución conjunta, pero toda resolución conjunta seguirá el mismo trá-mite de un proyecto de ley”. Art. Ill, Sec. 18, Const. P.R., L.P.R.A., Tomo 1, ed. 2008, pág. 399.

(7) Obsérvese que la enmienda propuesta por el señor Reyes Delgado fue derro-tada por razón de que las resoluciones conjuntas son de naturaleza especial y era innecesaria la inclusión propuesta. No obstante, todos los delegados que intervinie-ron estuvieron de acuerdo con el señor Reyes Delgado en que las resoluciones con-juntas, por su naturaleza limitada y específica, no pueden tener el efecto de enmen-dar una ley de carácter ilimitado y permanente. 2 Diario de Sesiones de la Convención Constituyente 857-863 (1951).

(8) Preliminar no es sinónimo de ofrecer información incompleta o a medias. Lo preliminar no se circunscribe a la sustancia o contenido de lo notificado, sino a una demarcación temporal, cronológica o hasta espacial (en su etimología latina); presu-pone una etapa previa a una notificación posterior. Por cierto, la acepción de preli-minar en el diccionario dispone: “Que antecede o se antepone a una acción, a una empresa, a un litigio o a un escrito o a otra cosa”. Real Academia Española, Diccio-nario de la Lengua Española, 22da ed., Madrid, Ed. Espasa Calpe, 2001, T. II, pág. 1822.

(9) Véase el esc. 3.

(10) Para el año en que se publicó el informe Voting Technologies in the United States (2001), E.A. Fischer era un Senior Specialist in Science and Technology de la *564 “Resources, Science, and Industry Division” del Congressional Research Service. En palabras de la página cibernética de la Biblioteca del Congreso:
“The Congressional Research Service (CRS) works exclusively for the United States Congress, providing policy and legal analysis to committees and Members of both the House and Senate, regardless of party affiliation. As a legislative branch agency within the Library of Congress, CRS has been a valued and respected resource on Capitol Hill for nearly a century.” Library of Congress, http://www.loc.gov/ ersinfo/ (última visita 25 de abril de 2012).

(11) “Paper or marksense ballots can easily be mismarked, for example by a voter circling the name of a candidate rather than marking the appropriate box”. (Enfasis suplido). Fischer, supra, pág. 8.

(12) La ley Help America Vote Act require que “People with disabilities must also be accommodated, through voting machines that ‘provid[e] the same opportunity for access and participation (including privacy and independence) as for other voters’ ”. Tokaji, supra, pág. 1733.

(13) “The Voting Accessibility for the Elderly and Handicapped Act of 1984 (42 U.S.C.A. sec. 1973ee) requires that election jurisdictions make available accessible polling places and aid to elderly and disabled voters”. Fischer, supra.

(14) “Obviously included within the right to choose, secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted”. U.S. v. Classic, 313 U.S. 299, 315 (1941).

(15) Nos unimos a las expresiones realizadas por el foro de instancia: “Es per-turbador que a pocos meses de las elecciones del 2012, que van a tener, no s [ó] lo las elecciones generales, sino además un plebiscito que afectará el futuro del país, se descanse en un sistema que desconocemos c[ó]mo operará”. (Enfasis suplido). Senten-cia del Tribunal de Primera Instancia, pág. 53.

(16) No perdamos de perspectiva que el Código Electoral es una ley de carácter ilimitado y permanente, por lo que un error insubsanable de la C.E.E. no revierte esa característica, sino que obliga a la agencia a cumplir nuevamente con el mandato legislativo y con la precaución que exige la propia ley.

(17) Recurso de Certificación de la C.E.E., pág. 17.

(18) “En cuanto a los planteamientos relacionados con las determinaciones del Tribunal de Primera Instancia, estas gozan de deferencia, por lo que en ausencia de un reclamo específico por la C.E.E. no intervendremos con la apreciación de la prueba realizada por el foro primario”. Sentencia, pág. 539. Esa sentencia añade que la “deferencia no se extiende a las conclusiones de derecho subsumidas e identifica-das erróneamente como determinaciones de hecho”. Id. Sin embargo, no se detallan palmariamente cuáles fueron los errores de identificación, sino que se limita a la generalización citada.

(19) Obsérvese que estos daños son los mismos que alegó el Partido Nuevo Pro-gresista recientemente cuando acudió el 2 de abril de 2012 ante este Foro mediante recurso de certificación y una mayoría de esta Curia decidió abrir las puertas del Tribunal al reconocerle al peticionario esos daños. PNP v. CEE y PPD I, 185 D.P.R. 283 (2012).